15 So.2d 713

**MUTUAL SAVINGS LIFE INS. CO. v. OSBORNE.**

8 Div. 253.

Supreme Court of Alabama.

Oct. 28, 1943.

Rehearing Granted Nov. 26, 1943.

See, also, 242 Ala. 589, 7 So.2d 319.

* * * * * * *

S. A. Lynne, of Decatur, for appellant.

Watts & White and John R. Thomas, all of Huntsville, for appellee.

THOMAS, Justice.

This is the second appeal. The facts are stated in Mutual Savings Life Insurance Co. v. Osborne, 30 Ala.App. 399, 7 So. 2d 314, 317 and 318, certiorari denied 242 Ala. 589, 7 So.2d 319.

The case was submitted to the jury on amended counts 1 and 2, and on the plea of the general issue. The judgment was for the plaintiff.

The suit was ex delicto grounded in the fraud and deceit (claimed) of defendant practiced upon plaintiff whereby the latter was induced to surrender and release a valuable cause of action then accrued on an insurance policy under which plaintiff was

the named beneficiary. The value of the policy and right of action thereunder was $1000, and the consideration for the release the sum of $287 paid by defendant in liquidation of a funeral bill incurred by beneficiary for assured. Plaintiff claimed the difference between these two sums.

The jury returned a verdict for the plaintiff; whereupon the defendant on November 9, 1942, filed its motion for new trial, which was not heard and continued by the court until December 15, 1942, when the motion was overruled and denied. Thus nothing was presented for review by the motion. Alabama Gas Co. v. Jones, 244 Ala. 413, 13 So.2d 873.

The respective tendencies of the evidence presented a conflict to the jury for decision. McMillan v. Aiken, 205 Ala. 35, 40, 88 So. 135. This was likewise the decision of the Court of Appeals. Osborne v. Mutual Savings Life Insurance Co., 30 Ala.App. 399, 7 So.2d 314.

The evidence of the witness Farrish tended to support the plaintiff's claim that assured met with an accidental death within the provisions of the policy. The defendant denied liability because the policy had not been delivered and was not in force. The offer of a compromise and payment of $175 for the funeral bill of $287 was brought about by Vickery, the adjusting agent of defendant.

The witness Osborne, among other things, testified that: " * * * and he [Vickery] said if I would sign that policy and the other policy over he would pay the undertaker's bill. He said it had lapsed, but he would take it up. That is, the old one. He told me what he would do, and I said, 'Wait and give me until in the morning to study it over'. And he said, 'No, I am going to do what I am going to do in the next fifteen minutes. I am due in Decatur now.' Asked by his counsel: 'Did you sign anything on the face of that policy' witness answered, 'Yes, sir, I studied a minute or two and I thought I wanted that undertaker's bill paid, and I thought he might be telling me the truth, and I signed both of them over to him.' I had no independent advice from anybody at that time as to this matter. * * *."

After the cross-examination, substantially to the same effect, defendant offered in evidence the plaintiff's affidavit, as follows:

" 'Know all men by these presents, that Mr. E. D. Graves told me on Wednesday, November 3, 1937, that he wanted me to sign some papers for a death claim and that he had a new policy on my son's life that had been issued before he died. He said that he had this policy in the office and was ready to deliver it to me on November 3rd. Now, if Mr. Graves had brought that policy out to us when it was issued, we would have paid on it and taken it out. Signed this the 17th day of November, 1937, at Huntsville, Alabama. (Signed) D. W. Osborne. Sworn and subscribed on this the 17th day of November, 1937, Florence Dodge, Notary Public.'

" 'Sometime that evening I told Mr. Vickery if I had known the policy wasn't in force I wouldn't have put as much in the ground as I did because I couldn't pay it. I told him that sometimes that evening I don't just know what time it was. I went back to the undertaker's office after that and then I went home. * * *' "

And the redirect examination was to the same effect.

The plaintiff offered in evidence the testimony of Homer Osborne who recalled the transaction with reference to the issuance of the policy which occurred a few weeks before the death of the assured; that the agent came out to collect on the old policy and stated that it would be better to take out a new policy; filled out the blanks and "Calvin pulled out a dollar bill and gave it to him and Mr. Graves gave him back some money"; that witness did not know how much change was given; that nothing had been said about the premium; that he saw assured after he applied for the policy, which is the basis of this suit, and that he appeared "to be in good health" on Saturday night before he was killed.

The defendant offered in evidence the former testimony of Bruce Patton to the effect that after the lapse of the first policy, Graves and the witness went to see Calvin Osborne to secure payment of premium which was not paid; that he was present a portion of the time on November 17th, and heard the conversation between Vickery and Osborne and that Vickery asked "me and Collier if they paid the funeral bill for Mr. Osborne it would be worth that much to the company as advertisement." He further stated that if Mr. Osborne would not be satisfied with taking a settlement of that nature, the best thing for him to do would be to see a lawyer, whereupon Osborne said "he felt like if the company did that he would be pleased with the Mu-

tual Savings"; that at the time in question the witness was working for the company and is still so connected; that he wasn't present at the time "Graves and Osborne came and Graves assisted Osborne in filling out the proof of loss"; that the "first time he saw the new policy was after the death had occurred."

Defendant offered the former testimony of Reedus Collier to the effect that he witnessed the application for the first policy; that he witnessed the release of Osborne of what is referred to as the second policy, and "was present at the time of that settlement"; that he was the field superintendent of defendant and is still connected with the company. The record shows "that on that occasion Mr. Vickery said to Mr. Osborne, in substance, that the company did not owe him anything, but that if it would get his good will, he would consider paying the undertaker's bill. He did say something about having gotten the statement about it from the one-time agent, Graves, that is, what Graves said about it. Mr. Vickery did not say anything about he wouldn't settle with him unless he settled in fifteen minutes, or gave him fifteen minutes to make the settlement. Mr. Osborne said that he would be a walking monument for the company if the company paid this undertaker's bill, that he had no money to pay it, and if they would pay it, he would' be a walking monument. Those were his words. Vickery said that he would only make the payment to get Mr. Osborne's good will. After the settlement with the undertaker, I drove Mr. Osborne home. On the way home he said that he was well satisfied * * *."

And on cross-examination this witness testified in part as follows: "* * * He said that after Mr. Vickery had told him that the company didn't owe him anything. He showed him the affidavit. I can't say that he told him that the policy had not been delivered, and that the policy wasn't in force. He told him that in substance before he ever got Osborne's signature to the release."

On re-direct examination the witness testified: "The things that I recall and that Vickery told Mr. Osborne was that he told him that he had been to see our agent, and that he had a signed statement from Mr. Graves as to what had taken place regarding the policy, and under that statement, there was no claim due under the policy, and, of course, if there had been any claim

he would not have told him that there was not, and he showed him the statement. He had the statement of Graves right there that he had gotten that day."

Defendant then offered in evidence the testimony of M. K. Vickery, who stated that he was at the time making investigation and had gotten a statement as to the claim and that he told Osborne that the reason he sent for him was that he had seen Graves, gotten a statement of facts, and explained that he would make a thorough investigation after the claim papers from him were received and return the affidavit taken from him. The witness testified: "This is the affidavit I took from Mr. Graves, and read to Mr. Osborne that night." Whereupon said affidavit was introduced in evidence. The reporter of decisions will set out the affidavit in the statement of facts.

And this witness continued: "After reading that affidavit, I told Mr. Osborne that I was there in his interest, as well as in the interest of the company; that I wanted to give him the whole picture, and if anything wasn't right, I wanted to get it straightened out; that I had gone to the trouble to bring him all of our side on behalf of his interest to see if we could get it straightened out. He said that he didn't know anything about it at all, except that the agent came there and said that he had a policy and for him to come up to the office. He said that he finally went up there, and that the agent took his papers to some office, said he didn't know that it hadn't been paid, and that if they would come to him he would have paid it. I told him that under the circumstances it wasn't a question of whether he would have paid it or not, it wasn't paid before his son's death, and that was the cause we denied any liability at all. That is as far as the conversation went at that time. After that, we went to the undertaker's office, and I met Mr. Herbert Farrish. I talked to him because there was an undertaker's bill of $286.00. Mr. Osborne had told me that the agent told him that the policy was in force, was why he contracted the bill. On the second occasion, I told Mr. Osborne that if Mr. Collier and Mr. Patton, who were with the company at that time, would bear me out in my action with the home office, if they thought it was worth that much to the company as good will advertising, that I would take care of the funeral expenses, that I thought it was worth that much, as good

will advertising. I never did tell him that he would have to do it in fifteen minutes. I told him that if that didn't satisfy him, to see his lawyer, that there was no rush about it at all."

On cross-examination the witness testified in part as follows: "I told Mr. Osborne to wait outside the office and when I talked to Mr. Farrish, I asked him what he would take to clean off the bill against Mr. Osborne. I finally agreed to pay him $175.00, and he agreed to take that. When I came out Mr. Osborne asked me what Mr. Farrish would do, and I told him that Mr. Farrish would give him a bill marked 'Paid in Full'; that he had a bill for $286.50, and that Mr. Farrish would give him a bill marked 'paid.' Mr. Osborne asked me if Mr. Farrish gave me anything off the funeral bill and I told him he would get the bill marked 'Paid in Full'."

 It is declared in this jurisdiction that a beneficiary under an insurance policy upon whom fraud and deceit is practiced, resulting in release of rights under same, has the right to repudiate the release contract and continue to claim under the policy, or he may elect to treat the rights released as lost and destroyed, and sue as for fraud and deceit. Sovereign Camp. W. O. W., v. Feltman, 226 Ala. 390, 147 So. 396; Id., 232 Ala. 570, 169 So. 9; Mutual Savings Life Ins. Co. v. Osborne, 30 Ala.App. 399, 7 So.2d 314, supra.

 A defrauded releasor is not limited to an action to set aside the release, but may affirm it, sue for damages for the fraud, and such suit may be brought without returning, or offering to return, the consideration for the release. 53 Corpus Juris, § 47; Mutual Savings Life Ins. Co. v. Osborne, 30 Ala.App. 399, 7 So.2d 314.

The rule is stated in Coleman v. Night Commander Lighting Co., 218 Ala. 196, 118 So. 377; Day v. Broyles, 222 Ala. 508, 133 So. 269.

In Shepherd v. Kendrick, 236 Ala. 289, 181 So. 782, the authorities are collected as to the expression of mere opinions and declarations of material facts or mixed questions of law and fact which induced a prejudicial action that may be repudiated by the party so defrauded. Fidelity & Casualty Co. of New York v. J. D. Pittman Tractor Co., 244 Ala. 354, 13 So.2d 669.

 When the whole evidence is considered, we are of the opinion that the statement of defendant's agent, with authority to act in the premises, were not merely expressions of an opinion of such agent, but were material statements of fact or mixed questions of law and fact, which induced the beneficiary named in the policy in question to forego his valid claim for the full amount of the policy. The situation of the parties is further illustrated by the following:

"* * * 'Q. Now what, if anything, did he tell you on that occasion about the policy coming in?

" 'He said if that policy hadn't done been in before my son got killed he couldn't have delivered it.'

"Continuing witness said: I signed a paper of some kind, I am not an educated man, I sort of write my name * * *."

The party testifying was the beneficiary of the policy, an old man of more than seventy years of age; and the agent referred to in his testimony was the adjuster, coming from the home office to investigate and settle claims.

 The terms of the policy as to payment of premium are stated by the court of appeals in Mutual Savings Life Ins. Co. v. Osborne, 30 Ala.App. 399, 7 So.2d 314, 317. The payment of the premium as and when required is the essence of the risk of insurance. This is to be evidenced by the written contract of insurance. New York Life Ins. Co. v. McJunkin, 227 Ala. 228, 149 So. 663. In the absence of stipulations to the contrary, the risk commences with the completion of the contract, whether that be affected by "approval of the application, the payment of the first premium, or the delivery of the policy." 2 Cooley's Brief on Ins., 2d Ed., 1390; National Life & Accident Ins. Co. v. Bridgeforth, 220 Ala. 314, 124 So. 886. The policy in question stipulated for the payment of the premium in advance. However, the jury could infer from the testimony of plaintiff's witness Homer Osborne that defendant's soliciting agent (when the application was taken for the policy) did receive from Calvin Osborne money for the premium, and that the weekly premium was duly paid at such time and up to the time of the violent death of the assured.

The court fully instructed the jury on the alleged fraud and the burden of proof which rested upon plaintiff touching the same. Likewise, the jury was duly instructed upon the law of the alleged compromise of a disputed claim of the parties that eventuated in the release on which the defendant relied.

 Charge 5 is an incorrect effort to define a legal fraud under the statute. Code 1940, Tit. 7, § 108, and authorities there cited applying to insurance; Accident Ins. Dept. of O. of R. C. of America v. Brooks, 216 Ala. 605, 114 So. 6. The charge is to be tested by the words of the statute and not by the honest intention of one who makes such misrepresentations of material facts. Sovereign Camp, W. O. W., v. Moore, 232 Ala. 463, 466, 168 So. 577. Under the statute the good faith of the party making such statement, if misleading, is immaterial. Bethea-Starr Packing & Shipping Co. v. Mayben, 192 Ala. 542, 545, 68 So. 814. The last clause employed in charge five—"is supposed to arise may reasonably be consistent with honest intentions"—vitiates the charge before us. Cartwright v. Braly, 218 Ala. 49, 117 So. 477; Mutual Savings Ins. Co. v. Osborne, 30 Ala.App. 399, 7 So.2d 314, 318; Code 1940, Tit. 7, § 108 et seq.; Harton v. Belcher, 195 Ala. 186, 70 So. 141.

The several questions of fact as to the payment of the initial premiums, the delivery of the policy and the legal fraud vel non, being controverted, were for the jury, and were duly submitted by the court. McMillan v. Aiken, 205 Ala. 35, 40, 88 So. 135. The verdict was not contrary to the great weight of the evidence.

The judgment of the circuit court is affirmed.

Affirmed.

GARDNER, C. J., and BROWN and LIVINGSTON, JJ., concur.

On Rehearing.

THOMAS, Justice.

It was decided by our early cases that one who is only authorized to solicit and take applications for insurance and receive the premiums and deliver the policy after having been signed by the proper officers has no authority, express or implied, to waive conditions precedent stated in the policy. Alabama State Mutual Assurance Co. v. Long Clothing & Shoe Co., 123 Ala. 667, 26 So. 655. This rule has been followed in Green v. Weschester Fire Ins. Co., 221 Ala. 344, 128 So. 436; Indemnity Company of America v. Bollas, 223 Ala. 239, 135 So. 174.

The provisions of the instant policy as to the requirement of payment of premiums will be set out in the statement of facts.

Under the contradictory evidence, or the reasonable inferences therefrom, as to the payment of the required premium on the policy declared upon, charges 6, 9 and 10, refused to the defendant, should have been given. In the failure to give these charges, reversible error intervened.

Since the case will be retried, we may say that charge 12, requested by the defendant, was abstract because there was no evidence or reasonable inferences therefrom that E. D. Graves attempted to waive payment of the first premium on the policy or that he actually delivered the policy without receiving payment of the first premium.

Charge 27 was covered by the oral charge of the court.

It follows from the foregoing, that the application for rehearing is granted, the judgment of affirmance heretofore rendered is set aside and vacated, and the judgment of the Circuit Court is reversed, and the cause is remanded.

GARDNER, C. J., and BROWN and LIVINGSTON, JJ., concur.