Phillip D. ELLIS and Marilyn N. Ellis, Plaintiffs,

v.

Richard ZUCK et al., Defendants.

Civ. A. No. 74–G–841–S.

United States District Court, N. D. Alabama, S. D.

March 1, 1976.

Richard F. Ogle, Denaburg, Schoel, Meyerson & Ogle, Birmingham, Ala., for plaintiffs.

Robert R. Bryan, Birmingham, Ala., for Richard Zuck.

Samuel G. McKerall, Shores & McKerall, Foley, Ala., for Wilma Zuck Aulsbrook.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GUIN, District Judge.

This cause was heard before the court, without a jury, on September 25, 1975. Plaintiffs' claims against the defendants Richard Zuck and Wilma Zuck Aulsbrook, Administratrix of the Estate of Gordon D. Zuck, deceased, were severed from the plaintiffs' claims against the

other two defendants, Ruth Zuck and Susan Morton, those claims having been previously tried by a jury. As to the two defendants *sub judice,* the claims of the plaintiffs were tried by the court, without a jury, and the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. On March 8, 1973, the plaintiffs executed a franchise agreement with Network Cinema Corporation to operate a "Jerry Lewis Cinema" in the Fort Walton Beach, Florida, area. The franchise agreement executed by the plaintiffs was for a single cinema location costing $17,500.00, of which $7,500.00 was paid directly to Network Cinema Corporation simultaneously with the execution of the contract. The balance of $10,000.00 was to be due upon the approval of a location from which the franchise would operate. In this action plaintiffs do not seek recovery of the $7,500.00 initial payment, but do seek recovery of all subsequent payments made by them for the franchise.

2. Although the plaintiffs had numerous conversations with the various defendants after the execution of the franchise agreement, it was not until July 5, 1973, that the plaintiffs actually met the defendants. Plaintiffs traveled from their home in Columbus, Ohio, to Birmingham, Alabama, where they met initially Ruth Zuck, Susan Morton and defendant Richard Zuck in their offices in Vestavia Hills, Birmingham, Alabama. At this meeting plaintiffs were told by Ruth Zuck that unless the remaining $10,000.00 was paid on the franchise fee, the defendants could not make any more efforts toward the obtaining of a location for the cinema. The plaintiffs agreed to have transferred from their

bank account in Columbus, Ohio, the necessary $10,000.00 to complete payment of the franchise fee. Plaintiffs obtained from Ruth Zuck a written agreement that the monies paid by the plaintiffs would be held in escrow and, in the event a lease was not signed within 60 days from that date, all monies would be refunded, less the defendants' expenses. No definite theater site had been secured by the date of the July meeting. Ruth Zuck and Susan Morton advised Mr. Ellis, however, that sites were available and that a location would be no problem.

3. Plaintiff Phillip D. Ellis testified that on the occasion of his meeting with the defendants in Birmingham he engaged in a telephone conversation with Gordon D. Zuck on one of the two telephone extensions in the defendants' offices.[1] During this conversation the defendant Gordon D. Zuck, now deceased, assured the plaintiffs that negotiations were under way in Fort Walton Beach to secure a cinema location. Later on the night of July 5 the plaintiffs were taken to the airport by Ruth Zuck, and at the airport they met the defendant Gordon D. Zuck who was returning from out of town. On this occasion the plaintiffs met Gordon D. Zuck personally for the first time. At this time Gordon D. Zuck welcomed the plaintiffs into the Jerry Lewis Cinema "family," and again assured plaintiffs that negotiations were under way for a Fort Walton Beach location at Brooks Plaza Shopping Center, that he anticipated no problems in completing arrangements for such a location within a short period of time, and that 100 per cent financing for the theater equipment would be available. The parties stipulated that Network Cinema Corporation, the parent corporation of Jerry Lewis Cinema, filed for bankruptcy in New York on July 3, 1973. Phillip

---

1. Counsel for the Estate objected to the testimony regarding the substance of the conversation on the grounds that Mr. Ellis was incompetent to testify thereto under Alabama's Dead Man's Statute. The court overruled the objection, in part, and allowed Mr. Ellis to testify as to the substance of a portion of the conversation during which Mrs. Zuck, who is not deceased, was, to Mr. Ellis's knowledge, listening on an extension. Mr. Ellis was not allowed to testify as to whatever he and Mr. Zuck may have said while they were the only parties to the conversation. *See,* Conclusions of Law, paragraph number eight, *infra.*

D. Ellis testified that the Zucks did not inform him of this fact during the July 5 meeting, and that he learned of it, on his own, a few weeks later.

4. Upon their return to Columbus, Ohio, the plaintiffs continued to have regular telephone conversations with the defendants, and each time were assured by the defendants that all negotiations were proceeding well and that, as before, no difficulties were anticipated. However, during this period of time no lease was ever entered into for this cinema location. Then, the plaintiffs, becoming anxious about the cinema location, made a trip to the Fort Walton Beach area in the first week of October, 1973, after advising the defendants of their intention to do so. An appointment was made by the plaintiffs to meet Ruth and Gordon D. Zuck in Fort Walton Beach. Upon meeting the plaintiffs in Fort Walton Beach, Ruth and Gordon D. Zuck again assured the plaintiffs that they were involved in negotiations for a cinema location at Brooks Plaza and that these negotiations were proceeding without any problems. The Zucks made arrangements to meet the plaintiffs for supper but they did not appear at the appointed time.

5. The next day, Phillip D. Ellis telephoned the Zucks' Birmingham office and spoke to Susan Morton about his missed appointments with Mr. and Mrs. Zuck. Susan Morton advised Mr. Ellis that one of the defendants would meet him in Fort Walton Beach the next day, October 2, 1973. Later in the day of October 1 Mr. Ellis went to the office of Mr. Jay Farris, a real estate agent who had been trying to help find a location for the cinema. At this time Mr. Ellis met one Larry Anchors who was in charge of leasing at Brooks Plaza, a shopping complex owned in part by Mr. Anchors' father. It was at this meeting that the plaintiffs learned, for the first time, from Larry Anchors that there had been no serious negotiations by the defendants with the owners of Brooks Plaza. It is clear from the stipulated testimony of Mr. Anchors that no such serious negotiations had ever taken place. In fact, it appears from Mr. Anchors' stipulated testimony that the first time any negotiations were ever had by any of the defendants with any of the principals of Brooks Plaza, relative to a cinema location for Mr. Ellis, was sometime in late July, several weeks after the plaintiffs had paid to the defendants $10,000.00 and had been repeatedly assured by Ruth Zuck, Gordon D. Zuck and Susan Morton that negotiations for a site at Brooks Plaza were well under way. Mr. Anchors' testimony clearly indicates that the only meeting he had with Gordon D. and Ruth Zuck never progressed beyond an inquiry stage between the Zucks and himself.

6. On October 2, 1973, the plaintiffs again went to the office of Jay Farris where they met with Susan Morton and Richard Zuck. It was at this meeting that the plaintiffs were advised for the first time, by any of the defendants, that in fact there was no possibility for a cinema location at Brooks Plaza. However, the plaintiffs were persuaded on this occasion by the two defendants present at this meeting to enter into a new franchise agreement for a twin cinema location in lieu of a single cinema location. In this regard, prior to signing this new franchise agreement, plaintiffs were assured by these two defendants, and by Ruth Zuck via telephone, that negotiations had already begun for a twin cinema location at the Fort Walton Square shopping center and that 100 per cent financing of the theater equipment would be available. Based on these assurances the plaintiffs executed a new franchise agreement and made arrangements for the transfer of an additional $12,500.00 from the plaintiffs' bank account to the account of Ruth Zuck. Prior to this arrangement for transfer, the plaintiffs were assured that the $12,500.00 would be treated in the same manner as the $10,000.00 payment on July 5; that is, it would be held in escrow and would be refunded to the plaintiffs if a lease was not negotiated within 60 days. At this meeting of October 2, 1973, the plaintiffs were shown

a sample lease contract which would be executed for the Fort Walton Square location and the plaintiff Phillip D. Ellis executed an Intent to Lease a location at the Fort Walton Square shopping center.

7. Plaintiffs moved to Fort Walton Beach in an effort to bring this cinema location to a reality. They encountered much difficulty, part of which was financing of a new location. The plaintiffs had been assured by the defendants, both prior to the payment of the $10,000.00 on July 5, 1973, and the additional $12,500.00 on October 2, 1973, that 100 per cent financing of the theater equipment would be available. However, this never proved to be a reality and the plaintiffs were, in fact, unable to obtain financing for the theater equipment. Also, Fort Walton Square shopping center was demanding that the plaintiffs furnish lease mortgage insurance. Because of plaintiffs' diminished financial capacity, from the payment of the $12,500.00, the plaintiffs were unable to secure any such insurance. Although the plaintiffs continued to work diligently in an effort to secure a site location for their franchise, none was ever forthcoming, and the plaintiffs had less and less contact with the defendants. On December 5, 1973, the defendant Gordon D. Zuck was murdered, and three defendants, among others, have been convicted of his murder. At no time have the plaintiffs ever secured a theater location for the exercise of their franchise rights.

8. The court makes the following specific findings in regard to the scenario constructed by the above general findings:

(a) that the representations made to plaintiffs prior to their payment of $10,000.00 on July 5, 1973, relative to the optimistic state of affairs in conjunction with locating a cinema location, were not based on fact, but were misrepresentations;

(b) that the plaintiffs did justly rely upon said misrepresentations to their injury;

(c) that similar misrepresentations were made to the plaintiffs prior to the execution of the second franchise agreement which preceded the payment of $12,500.00 by plaintiffs, upon which plaintiffs relied to their detriment;

(d) that Richard Zuck and Gordon D. Zuck, along with Susan Morton and Ruth Zuck, did fail to disclose material facts concerning the status of the franchise arrangement to the plaintiffs;

(e) that Richard Zuck and Gordon D. Zuck, along with Susan Morton and Ruth Zuck, did make statements and promises which they did not intend to perform at the time same were made to plaintiffs, to the detriment of plaintiffs;

(f) that defendant Richard Zuck on several occasions made misrepresentations, failed to disclose material facts, and made promises without the present intention to perform same, all to the injury of plaintiffs;

(g) that defendant Gordon D. Zuck on several occasions made misrepresentations, failed to disclose material facts, and made promises without the present intention to perform same, all to the injury of plaintiffs;

(h) that there existed, at all pertinent times hereto, among Richard Zuck, Gordon D. Zuck, Ruth Zuck and Susan Morton, a conspiracy to defraud plaintiffs in regard to the franchise arrangement entered into by plaintiffs on July 5, 1973, as modified October 2, 1973;

(i) that Ruth Zuck as a part of said conspiracy, did wrongfully detain certain sums of money from plaintiffs and appropriated said sums to an improper use; further, that as a part of the conspiracy Ruth Zuck did breach the written contract of July 5, 1973, and the oral contract of October 2, 1973, to refund $22,500.00 to plaintiffs in the

event that no lease of the cinema location was arranged.

The court deems it unnecessary to make specific findings concerning the financial information provided by the Zucks to the plaintiffs.

9. The court finds plaintiffs entitled to recover actual or compensatory damages in the amount of $22,500.00. The court further finds plaintiffs entitled to an award of punitive damages in the amount of $22,500.00, for a total award of $45,000.00.

## CONCLUSIONS OF LAW

The complaint in this case raises four separate causes of action: fraud, conspiracy to defraud, conversion, and breach of contract. While many of the transactions in question occurred in Florida, the parties agree that the case is controlled by the law of Alabama.

1. Code of Alabama, title 7, §§ 107–110 (Recomp.1958), establish a cause of action for fraud. Under the headings "Misrepresentations," "Suppression of Truth," and "Deceit," the code has enacted the basic common law of fraud. While some distinctions between fraud and deceit can be drawn, they generally depend upon similar facts. It appears that plaintiffs' claims more clearly qualify as allegations of fraud, but to the extent that plaintiffs also allege a conspiracy to defraud, a claim of intent to deceive or of deceit is implicit.

■ 2. The cumulative effect of these sections is that liability may arise from a willful deception, an innocent misrepresentation concerning an existing fact, a reckless misrepresentation made without knowledge of its falsity, or the suppression of a material fact rather than an active misstatement. *See, Standard Oil Co. v. Myers,* 232 Ala. 662, 169 So. 312 (1936) (willful deception); *Birmingham Broadcasting Co. v. Bell,* 259 Ala. 656, 68 So.2d 314 (1953) (innocent misrepresentation); *Southern Building & Loan Ass'n v. Holmes,* 227 Ala. 1, 149 So. 861 (1933) (statements recklessly made); *Groover v. Darden,* 259 Ala. 607, 68

So.2d 28 (1953) (suppression actionable). However, it is clear that before liability for nondisclosure or suppression of facts will arise there must be special circumstances which give rise to an obligation to disclose. *Hall Motor Co. v. Furman,* 285 Ala. 499, 234 So.2d 37 (1970).

■ 3. The critical elements of an action for fraud generally include:

(a) a false representation concerning an existing material fact, *Birmingham Broadcasting Co. v. Bell, supra;*

(b) a representation which (1) the defendant knew was false when made, or (2) was made recklessly and without regard to its truth or falsity, or (3) was made by telling plaintiff that defendant had knowledge that the representation was true while not having such knowledge, *Hockensmith v. Winton,* 11 Ala. App. 670, 66 So. 954 (1914);

(c) reliance by the plaintiff on the representation and that he was deceived by it, *Bynum v. Rucker,* 235 Ala. 353, 179 So. 241 (1938);

(d) reliance which was justified under the circumstances, *Fidelity & Cas. Co. v. J. D. Pittman Tractor Co.,* 244 Ala. 354, 13 So.2d 669 (1943);

(e) damage to the plaintiff proximately resulting from his reliance, *Smith v. Smith,* 266 Ala. 118, 94 So.2d 863 (1957).

4. Of course, under certain special circumstances elements must be added to those listed above. As previously alluded to, in order for suppression of facts to be actionable a duty to disclose must exist. A number of cases construing Section 109 of the Alabama Code indicate a confidential or fiduciary relationship must exist. However, the types of relationships wherein a duty to disclose has been found indicate that the Alabama courts give little attention to the designation of the relationship, such as vendor-vendee, etc., but instead look to the relative bargaining positions of the parties. *See, Hall Motor Co. v. Furman, supra; Metropolitan Life Ins. Co. v. James,* 238 Ala. 337, 191 So. 352 (1939). Where one party has some particular knowledge or expertise not shared by

the plaintiff a duty to disclose has been recognized. *Cf., Collier v. Brown,* 285 Ala. 40, 228 So.2d 800 (1969). While this state has not had occasion to consider the relationship between franchisor and franchisee, a few courts and several commentators have suggested that a confidential and fiduciary relationship exists between parties to a franchise arrangement. *Broomfield v. Kosow,* 349 Mass. 749, 755, 212 N.E.2d 556, 560 (1965); *Meinhard v. Salmon,* 249 N.Y. 458, 467, 164 N.E. 545, 548 (1928); *See also, Rosenfeld, Big Brother as a Fiduciary: Suing the Franchisor,* Case & Comment, July–Aug. 1971, at 28. Brown, *Franchising: Fraud, Concealment and Full Disclosure,* 33 Ohio St.L.J. 517, 548 (1972); Goodwin, *Franchising in the Economy: The Franchise Agreement as a Security Under Securities Acts,* 24 Bus.Law 1311, 1319 (1969). Other courts have recognized the disparity between the parties to a franchise arrangement as requiring a duty to disclose. *See e. g., Weaver v. American Oil Co.,* 257 Ind. 458, 276 N.E.2d 144 (1971).

■ Nevertheless, even though one is under no obligation to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiry, he is bound not only to state the truth but also not to suppress or conceal any facts within his knowledge which will materially qualify those stated; if he speaks at all, he must make a full and fair disclosure. *Jackson Co. v. Faulkner,* 55 Ala. App. 353, 315 So.2d 591 (1975). So it is that if a franchisee raises a question the franchisor must avoid half-truths. *Maxwell v. Ratcliffe,* 356 Mass. 560, 562–63, 254 N.E.2d 250 (1969).

■ 5. Under these facts this court concludes that the defendant had a duty to disclose material facts concerning the difficulties regarding this franchise agreement, because (1) the parties were not dealing at arm's length, but there existed a disparity of positions which under the circumstances created a duty to disclose, and (2) the plaintiffs raised several questions to which defendants responded, and which required further disclosure.

■ 6. Another special circumstance which may give rise to an additional element of fraud concerns misrepresentations regarding future events. Ordinarily, a statement regarding an event to take place in the future, or a promise to do some act, will not support an action for fraud unless there is present at the time the statements or promises are made an intention to deceive or not to do the act promised. *Birmingham Broadcasting Co. v. Bell, supra.* Therefore, in this situation a specific intent to deceive or not to perform is an additional element. *Walker v. Woodall,* 288 Ala. 510, 262 So.2d 756 (1972).

■ 7. The court has found that the defendants made misrepresentations concerning future events and promises to perform certain acts. It has also found that defendants, at the time the misrepresentations or promises were made, had the intent to deceive the plaintiffs as to the status of the franchise arrangement and had an intent not to perform the promised acts. Therefore, the court concludes that defendants' misrepresentations of future events or promises would support an action for fraud.

■ Of course, as previously stated, the intent to deceive is not a general requirement under Section 108, since innocent misstatement may also support an action for fraud. *Mutual Savings Life Ins. Co. v. Osborne,* 245 Ala. 15, 15 So.2d 713 (1943). Scienter is only required if the acts complained of are misrepresentations concerning future events or are promises. Misrepresentations of existing facts require no proof of scienter. *Fidelity & Cas. Co. of N. Y. v. Pittman Tractor Co.,* 244 Ala. 354, 13 So.2d 669 (1943). There are misrepresentations of both types involved in this lawsuit. This court has found the essential elements of fraud as to both types of misrepresentations. The court therefore concludes that plaintiffs have satisfied by a preponderance of the evidence all the necessary elements of actionable fraud as codified by Alabama statute.

■ 8. Plaintiffs in their complaint allege that each of the defendants was individually guilty of acts of fraud. The court has made findings concerning the acts of defendant Richard Zuck and has found that he did commit acts of actionable fraud as to the plaintiffs. As to the defendant Gordon D. Zuck, sued through his estate, the court allowed testimony of plaintiff Phillip D. Ellis concerning certain misrepresentations made by Gordon D. Zuck. Code of Alabama, title 7, § 433 (Recomp.1958), is commonly referred to as the "Dead Man's Statute." The effect is to render incompetent testimony by one interested in the outcome of the suit concerning transactions occurring between the "dead man" and the witness. However, there are certain exceptions to the exclusionary rule of this statute, one of which allows testimony of certain statements by Gordon D. Zuck. Transactions with or statements by a deceased person are not within the exclusion of this statute when conversations were between the deceased, the witness and one or more others associated with the deceased in the transaction, for such other one, still living, may give his version of the transaction and therefore the reason for the exclusion does not exist. *Homewood Dairy Products Co. v. Robinson,* 254 Ala. 197, 48 So.2d 28 (1950).

The court has found that the statements made by Gordon D. Zuck, which were allowed into evidence because of an exception to the Dead Man's Statute, would constitute misrepresentations supporting an action for fraud. However, the court need not bottom its findings as to the liability of the Estate of Gordon D. Zuck upon these misrepresentations alone, because plaintiffs have also charged defendants with a conspiracy to defraud.

■ 9. A civil conspiracy is a combination between two or more persons to accomplish by concert an unlawful purpose or to accomplish a purpose not in itself unlawful by unlawful means. *Bankers' Fire & Marine Ins. Co. v. Sloss,* 229 Ala. 26, 155 So. 371 (1934). A conspiracy is defined by Alabama law as:

. . . [T]he combination of two or more persons to do (a) something that is unlawful, oppressive, or immoral; or (b) something that is not unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means; or (c) something that is unlawful, oppressive, or immoral, by unlawful, oppressive, or immoral means.

*Barber v. Stephenson,* 260 Ala. 151, 69 So.2d 251 (1953), at 254.

■ A conspiracy can be actionable even though based on allegedly fraudulent representations of future occurrences, since fraud may be based on a promise made with no intention to perform it. *Barber v. Stephenson, supra.* Where civil liability for conspiracy is sought to be enforced, the conspiracy itself furnishes no cause of action; the gist of the action is not the conspiracy alleged but the wrong committed. *O'Dell v. State ex rel. Patterson,* 270 Ala. 236, 117 So.2d 164 (1960). However, conspiring to defraud will constitute a cause of action if the conspiracy has caused damage to plaintiff, and the damage is the natural and proximate consequence of the acts of the conspirators. *National Park Bank of New York v. Louisville & N. R.R. Co.,* 199 Ala. 192, 74 So. 69 (1917).

■ 10. Defendants contend that Richard Zuck and Gordon D. Zuck were not involved in transactions with plaintiffs at all the times pertinent to plaintiffs' claims of fraud. Alabama law recognizes that liability for conspiracy to defraud does not require the active participation of all members at all relevant times. As stated by the Alabama Supreme Court in *Barber v. Stephenson, supra:*

It is only by looking to the conduct of the alleged conspirators during the progress of the conspiracy and the end result achieved that usually such a fact [conspiracy] is established. And to that end it is proper to consider evidence extending over a considerable period, both before and after the date of the alleged combination and even after its termination, just so the proof

has a tendency to establish the ultimate fact.

69 So.2d at 255.

Where a conspiracy is established, all conspirators are civilly liable for the act of any in pursuance of the original plan and for the common object, even though not intended as a part of the original design. *National Park Bank of New York v. Louisville & N. R.R. Co., supra.* Each conspirator appoints the other as his agent. *Foster v. State,* 43 Ala.App. 435, 191 So.2d 523, *cert. denied* 280 Ala. 713, 191 So.2d 527 (1966). A conspirator can be held responsible for acts of coconspirators in furtherance of their scheme, even though he had, to some extent, departed the scene. *Herpich v. Wilder,* 430 F.2d 818 (5th Cir. 1970) (applying Alabama law).

■ The court, and also the jury which tried two of these defendants, found that Susan Morton, Ruth Zuck, Gordon D. Zuck and Richard Zuck did conspire to defraud plaintiffs, and the overt acts of the conspirators proximately caused the injury of the plaintiffs. Therefore, the court concludes that the defendants presently before the court, i. e., Richard Zuck and the Estate of Gordon Zuck, are liable for conspiracy to defraud.

■ 11. Under Code of Alabama, title 7, §§ 108, 109 or 110, a plaintiff injured by fraudulent representations is entitled to recover all damages which were within the contemplation of the parties or which were either necessary or the natural proximate consequence of the fraud. *Fidelity & Cas. Co. of N. Y. v. Pittman Tractor Co., supra.* Furthermore, if the fraud is malicious, oppressive or gross, and the representations were made with a knowledge of the falseness, or were so recklessly made as to amount to the same thing, or were with the purpose of injuring the plaintiff, there can be a recovery for punitive damages. But, *cf., Boriss v. Edwards,* 262 Ala. 172, 77 So.2d 909 (1955); *Caffey v. Alabama Machinery & Supply Co.,* 19

Ala.App. 189, 96 So. 454 (1923); *See also, District 20, U.M.W.A. v. Sams,* 287 Ala. 312, 251 So.2d 613 (1971).

■ The court concludes that this case is one which calls for the imposition of punitive damages, and is one in which such damages are properly awardable. The court concludes that the natural and proximate damages to plaintiffs which are recoverable as actual damages are $22,500.00. The court assesses punitive damages at $22,500.00, for a total judgment of $45,000.00.

■ 12. Plaintiffs' two other claims of conversion and breach of contract, while equally valid, require no elaborate conclusions considering the court's findings and the above conclusions of law as to fraud. Suffice it to say that Alabama courts have held that to constitute a conversion, "there must be a wrongful taking, or a wrongful detention, or an illegal assumption of ownership, *or an illegal use or misuser.*" *Jones v. Americar, Inc.,* 283 Ala. 638, 219 So.2d 893 (1969); *Webb v. Dickson,* 276 Ala. 553, 165 So.2d 103 (1964); *Consolidated Graphite Corp. v. Kelly,* 227 Ala. 516, 150 So. 682 (1933). It is well settled that money can be the subject of conversion. *Hall v. Hall,* 241 Ala. 397, 2 So.2d 908 (1941). When the conversion is attended by rudeness, wantonness, recklessness, or insulting manner, or accompanied by circumstances of *fraud,* oppression, aggravation, or gross negligence, punitive damages may be awarded. *E. g., Progressive Finance Co. v. Milner,* 45 Ala.App. 684, 236 So.2d 349 (1970).

■ 13. Plaintiffs would be equally entitled to recover upon their claim of conversion the judgment entered on the claim of fraud. Also, as to the claim of breach of contract, the court concludes that the legal elements of that claim are also present and actual, but not punitive, damages are recoverable on this theory also, as aforesaid. Therefore, judgment will be issued for plaintiffs.