Appeal by defendant, Coastal Concrete Company, Inc. ("Coastal"), from a judgment against it based upon a jury verdict for plaintiff, Thomas R. Patterson, in plaintiff's action based upon fraud. We affirm.
The complaint consisted of two counts. Count Two became the victim of defendant's motion for a directed verdict; thus, only Count One was submitted to the jury. Count One alleged:[1]
 "1. On or about May 1, 1983, the Plaintiff was an employee of Coastal Concrete Company, Inc., and on or about that same day, the Plaintiff was fired from his position with said Defendant. After firing the Plaintiff, the Defendant refused to pay the Plaintiff for his last week of work and the Plaintiff filed suit, representing himself, in the Small Claims Court of Baldwin County, Alabama.
 "2. Soon after he was fired from his employment, the Plaintiff made application for unemployment compensation and the Defendant opposed said application.
 "3. On or about June 24, 1983, the Plaintiff came to Court in the Small Claims Court of Baldwin County, Alabama, to pursue his claim for his last week's wages and the Defendant appeared in Court and agreed with the Plaintiff, pursuant to Plaintiff's Exhibit # 1, attached hereto and made a part hereof, that the Defendant would [instate] Plaintiff's unemployment compensation in return for the Plaintiff dropping his Small Claims Court case.
 "4. In reliance upon the Defendant's representation that it would [instate] the Plaintiffs unemployment compensation, the Plaintiff dropped his suit in the Small Claims Court of Baldwin County, Alabama.
 "5. At the time the Defendant represented to the Plaintiff that it would [instate] the Plaintiff's unemployment compensation, the Defendant had no intention of so [instating] said unemployment compensation and did, in fact, turn right around and appear in opposition to said [instatement] before the State of Alabama Department of Industrial Relations Unemployment Compensation Agency. Due to said opposition put forward by the Defendant, the plaintiff was denied his unemployment compensation.
 "6. The Defendant misrepresented its intention to [instate] the Plaintiff's unemployment compensation, the Defendant knew that it had no intention of so [instating] the unemployment compensation at the time it made the misrepresentation to the Plaintiff. The Plaintiff relied on said misrepresentation to his detriment, and has suffered damages due thereto."
The jury returned a verdict in favor of plaintiff and awarded $27,153.14 as damages.
The recitations of Count One contain many of the essential facts; however, some additions are necessary.
It appears that Patterson's claim in district court was for lost wages in the amount of $444.79, which included $20.00 in travel expenses. While this case was pending, Patterson, a concrete truck driver, was notified that his separate claim for unemployment compensation had been denied, based on his employer's statement that he had failed to clean off the build-up material *Page 826 
on his truck. Patterson, claiming extenuating circumstances, appealed from that ruling, and his appeal on the unemployment compensation claim was pending when his small claims case for lost wages came up for a hearing.
At the hearing in small claims court, Patterson appearedpro se, and Roland Snarr, an employee of Coastal, appeared for the company. A settlement was reached by the parties. According to plaintiff, he agreed to dismiss his lawsuit if Coastal would pay him half his last week's wages and have his unemployment compensation instated. The trial court, in fact, entered the following order in the case: "By agreement — Def. to lift opposition to unemployment — pay pl. one half of wages and court costs." On the date of that entry, Patterson went to Coastal's Robertsdale office and signed a release that had been prepared for Coastal at the direction of one of its employees, Richard Summerville:
 "I, Thomas R. Patterson, do hereby release Coastal Concrete from all claims in connection with Small Claims Court — Case Number 483 — settled on above date. I have received a check (# 254) in the amount of $153.14 as agreed upon. Coastal Concrete agrees to have my unemployment [instated] as soon as possible."
At the hearing on Patterson's appeal from the denial of his unemployment compensation claim, Richard Summerville appeared for Coastal. His testimony at the hearing on appeal, however, was consistent with that on which the original denial of unemployment compensation was based, i.e., that Patterson had been discharged for failure to keep his equipment clean. On that basis, Patterson lost his appeal, and this lawsuit ensued.
On appeal, defendant presents a number of issues concerning the trial court's denial of its motion for a directed verdict at the close of the evidence; its denial of defendant's motion for judgment notwithstanding the verdict or new trial; the plaintiff's failure to refund the consideration he received before his rescission of the release entered into by the parties; and the failure of plaintiff to prove actual damages. We will consider these issues seriatim.
 I.
Did the trial court err in denying defendant's motion for a directed verdict?
The answer to this question is dependent upon the presence or absence of "any evidence," or a scintilla thereof, of fraud.Allstate Enterprises, Inc. v. Alexander, 484 So.2d 375, 376
(Ala. 1985).
"Fraud" is defined as (1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation.Earnest v. Pritchett-Moore, Inc., 401 So.2d 752 (Ala. 1981). If fraud is based upon a promise to perform or abstain from performing in the future, two additional elements must be proved: (1) the defendant's intention, at the time of the alleged misrepresentation, not to do the act promised, coupled with (2) an intent to deceive. Clanton v. Bains Oil Co.,417 So.2d 149 (Ala. 1982).
The testimony bearing upon the existence of "any evidence" of fraud came from the testimony of Richard Summerville, from which we quote extensively here:
"Q. Would you read the note that the Judge put in the file there? Would you read that to the Jury?
"A. '6-24-83. By agreement, Defendant to lift opposition to unemployment and pay Plaintiff one-half of wages and court cost. Rebecca Wolf represents Plaintiff and will check with Coastal Concrete on lifting suspension. Otherwise court to enter judgment for either Defendant or Plaintiff for entire amount.' And initials.
"Q. It says on there 'By agreement, Defendant to lift opposition to unemployment.' Is that what it said?
"A. Yes, it did.
"Q. And let me show you Plaintiff's Exhibit Number One and does that appear to be on Coastal Concrete Company letterhead? *Page 827 
"A. Yes, it does.
"Q. Do you know who drew it?
"A. Diane White
"Q. Did she draw it at your direction?
"A. Yes, she did.
"Q. So you directed her to draw this agreement; is that correct?
"A. Yes, I did.
"Q. And does this say Coastal Concrete agrees to have myunemployment [instated] as soon as possible? Is that what thelast line says?
"A. The last line, yes, sir.
"Q. And you directed her to prepare that; is that correct.
"A. Not in those words, I did not.
"Q. Well, you had better tell the Jury what words you told her to use then.
"A. To help him have his unemployment benefits [instated].
"Q. Well, that's what it says; doesn't it?
"A. It says, 'Agrees to have my unemployment [instated] as soon as possible.'
"Q. Your lady prepared this; didn't she?
"A. Yes.
"Q. At your direction?
"A. Yes.
"Q. She was working for the company when she prepared it; wasn't she?
"A. Yes, sir.
"Q. Agent of the company?
"A. Yes, sir.
"Q. And that is what y'all drew up for Mr. Patterson to sign in return for dropping his lawsuit; is that correct?
"A. Repeat.
"Q. That is what you all drew up in return for him droppinghis lawsuit; is that correct?
"A. Yes, that is correct.
"Q. Well, I want you to look over there at that Jury and tell them what you have done to help him get his unemployment [instated].
"A. I did everything that he asked me.
"When Ronnie came to the office, and I can't remember what date it was, but it was after this letter was signed. And asked me that particular day what I had done to help him to date and I, in return, asked him what he wanted me to do and he didn't know and I had never been through it before and I didn't know.
"Within the next few days, I received notice to appear and that is what I did. That is all I knew to do, was to show up at the hearing.
"Q. So you didn't do anything to help him; did you?
"A. I just told you, I showed up at the hearing.
"Q. Showed up at the hearing and testified that he wouldn't keep his truck clean and that he had plenty of time to do it; is that right?
"A. Certainly, I was under oath to tell the truth.
"Q. Did you tell him that you were going to say all of this at the time that you drew up the agreement?
"A. No, I didn't. I didn't know what the questions would be.
"Q. You didn't know what the questions would be, you just,then I guess, drew up the agreement and agreed not even knowingwhat you were going to do? Correct?
"A. That is correct. I didn't know what I was going to do.
"I told Ronnie that I would help him but I had never been faced with this before. I didn't know what steps to take.
"Q. You had never testified before in an unemployment hearing?
"A. Not in regard to this.
"Q. Not in regard to this but you have testified; haven't you?
"A. In one other case.
"Q. In one other case. Well, don't you know that if you go over there and testify to something bad about the person that it is not going to help them? *Page 828 
"A. I didn't know what information they had on them. I didn't respond to the original inquiry from the State.
"Q. Who responded to that?
"A. Diane White.
"Q. And she works under you; doesn't she?
"A. Yes, she does.
"Q. And it was readily available to you; wasn't it?
"A. (Pause.)
"Q. Or was it?
"A. Was what?
"Q. The record with respect to this man's unemployment?
"A. Oh, yes.
"Q. It was readily available to you?
"A. Yes, sir.
"Q. It was readily available to you at the time y'all askedhim to drop his lawsuit in return for y'all's little promise tohim; wasn't it?
"A. Yes. We keep employee records.
"Q. So all you had to do was pick up the record and look and see what your company said about this man; didn't you? That's all you had to do; wasn't it?
"A. Repeat that, please.
"Q. All you had to do was pick up the records and see whatyour company said about the man on the first application; isn'tthat correct?
"A. Yes.
"Q. And you didn't do that; did you?
"A. I knew what had been put in there.
"Q. I thought you just said you didn't know what the response had been?
"A. I didn't know verbatim what the response had been butI knew what my secretary had put in there. I had given herreason for termination.
"Q. Okay. And did you think at the time you had this agreement drawn up that your — did you think that information was going to help this man get his unemployment [instated]?
"A. I didn't know.
"Q. You didn't know but you agreed to help him anyway; didn'tyou?
"A. I agreed to help him.
"Q. And you didn't even know; did you?
"A. I didn't know what I could do to help him in that matter.
"Q. You didn't tell him that though; did you?
A. Yes, I did.
"Q. When did you tell him?
"A. When he came by the office —
"Q. After the agreement was already signed?
"A. Yes.
"Q. And after he had already dropped his lawsuit?
"A. (No response.)
"Q. Right?
"A. Yes, it was after the agreement was already signed.
"Q. Did he tell the truth while ago when he testified that you had reevaluated it and that you had decided that he probably didn't have time to clean his truck up?
"A. No, he didn't tell the truth.
"Q. He didn't tell the truth. So he lied about that. But y'all did have a conversation; didn't you?
"A. We had a conversation.
"Q. And you simply told him that you didn't know what you could do for him?
"A. I said that I would help him if I could and asked him what he had done up to date. And I didn't know what to do.
"In this particular situation, I didn't know what to do.
"Q. But you didn't state that when you asked him to drop his lawsuit; did you?
"A. (No response.)
"Q. Said you would help him; didn't you?
"A. That is right.
"Q. And evidently, Mr. Snarr agreed a little bit further. Itsays: 'By agreement, *Page 829 Defendant to lift opposition to unemployment.'
"Is that what it says?
"A. That is what it says.
"Q. But you knew at the time this agreement was made, did you not, . . . what you had already told your secretary to put in that first response; is that correct?
"A. Repeat that.
"Q. You told us that you told your secretary, Ms. White, to put in the response to the unemployment thing, you had already told her what to put in there; hadn't you?
"A. No, she knew what to put in there, the reason for termination which was in his file.
"Q. How did she know?
"A. That's practice, that's policy at the —
"Q. Who directed that to be put into the file?
"A. I directed that to be put into the file.
"Q. So you knew [why] he had been terminated?
"A. Yes.
"Q. And you knew that if you were called on to testifytruthfully in front of the unemployment people that you had totell them that he was terminated for misconduct; didn't you?
"A. If I had thought about that, yes, I would have known.
"Q. If you had thought about it.
But you didn't tell him at the time you got him to drop hislawsuit; did you?
"A. No, I didn't.
". . . .
"Q. You simply said we are going to help him.
"Well it really doesn't say that. It says, 'Have theemployment [sic] [instated].' It doesn't say anything abouthelping; does it?
"A. No.
"Q. Says it was going to have it [instated] and your ladyprepared it at your direction; didn't she?
"A. That is right.
"Q. And when that was prepared, you knew why that was in thefile? You knew why he had been terminated?
"A. Yes, I did.
"Q. Why didn't you tell him that is what your testimony wouldhave to have been?
"A. It never entered my mind to tell him.
"Q. You knew what you were agreeing to do there; didn't you.
"A. To help him try to get his unemployment benefits [instated].
"Q. But you knew you couldn't do that; didn't you?
"A. No, I didn't know that.
"Q. You didn't know one way or the other; did you?
"A. I didn't know whether I could or couldn't but I would try to help him." (Emphasis added.)
The jury had before it this evidence and the testimony of the plaintiff, himself, who denied that he was given adequate time to clean his truck. The jury could have reasonably concluded from the evidence that Coastal agreed to withdraw its charge against plaintiff, to the end that his unemployment compensation would be instated in exchange for plaintiff's dropping his lawsuit. Indeed, the jury could have concluded that, having procured that action on plaintiff's part, Coastal, through Summerville and Snarr, knowing that plaintiff had dismissed his small claims case, obtained the release from him on the representation that it would take steps to have plaintiff's unemployment compensation instated, knowing at the time that it would not do so, with the intent to deceive him into releasing Coastal. Summerville clearly acknowledged his authorship of the release and its terms, but "didn't know what he was going to do," in spite of his personal knowledge of plaintiff's work record and of the grounds for his discharge. Thus, there *Page 830 
was evidence of fraud on Coastal's part as it is defined in our law, and the trial court was not in error in denying the defendant's motion for a directed verdict.
 II.
The same result obtains as to the trial court's denial of the defendant's motion for judgment notwithstanding the verdict or for new trial. A motion for J.N.O.V., like the motion for directed verdict, tests the sufficiency of the evidence,Wright v. Fountain, 454 So.2d 520 (Ala. 1984), and requires the trial court to review its earlier ruling on the directed verdict motion. Having found some evidence of fraud, we affirm the trial court's ruling denying the defendant's motion for J.N.O.V. or for new trial.
 III.
Was plaintiff required to return the money he received under the release as a prerequisite to maintaining his action for fraud?
The longstanding rule in Alabama is that a defrauded releasor may affirm the release and sue for damages for the fraud without returning or tendering the consideration for the release. Mutual Savings Life Ins. Co. v. Osborne, 245 Ala. 15,15 So.2d 713 (1943). Thus, plaintiff here was not required to return the $153.14 received as consideration for the release.
 IV.
Plaintiff's allegations of fraud pertained to the award of unemployment compensation, which had been denied because of the defendant's report of discharge for unsatisfactory job performance. For aught that appears, the removal of this contested reason would have allowed plaintiff to obtain compensation. This loss sustained by plaintiff amounted to more than nominal damages. Since at least nominal damages would have been proper, the jury was within its province to award punitive damages. Mid-State Homes v. Johnson, 294 Ala. 59, 311 So.2d 312
(1975); Welch v. Evans Bros. Construction Co., 189 Ala. 548,66 So. 517 (1914).
Having addressed the issues dispositive of this appeal, we need not address other issues of no consequence thereto.
Let the judgment be affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, ALMON and HOUSTON, JJ., concur.
[1] Throughout Count One, plaintiff used the term "reinstate" when, from the facts alleged, it appears the proper term to use is "instate," which we have so substituted where necessary throughout this opinion.