William Aubrey **DOMINICK**, Jr., et al. Plaintiffs-Appellants,

v.

**DIXIE NATIONAL LIFE INSURANCE COMPANY, et al.,** Defendants-Appellees.

Robert Lyle **FUNDABURK,** Plaintiff-Appellant,

v.

**DIXIE NATIONAL LIFE INSURANCE CO., et al.,** Defendants-Appellees.

Robert E. **JOHNSON,** Jr., Plaintiff-Appellant,

v.

**DIXIE NATIONAL LIFE INSURANCE CO.,** a corporation, Lincoln National Sales Corporation of Central Alabama, a corporation, and the Lincoln National Life Insurance Company, a corporation, Defendants-Appellees.

Carlton S. & Chrystle **BONE,** Plaintiffs-Appellants,

v.

**DIXIE NATIONAL LIFE INSURANCE CO.,** Lincoln National Sales Corporation of Central Alabama; and the Lincoln National Life Insurance Company, Defendants-Appellees.

Jerry Lee **FOWLER,** Plaintiff-Appellant,

v.

**DIXIE NATIONAL LIFE INSURANCE CO.,** Defendant-Appellee.

Russell Jeffrey **PINYAN,** Plaintiff-Appellant,

v.

**DIXIE NATIONAL LIFE INSURANCE CO.,** Milton L. Culver, Defendants-Appellees.

**1560**

Gilmer R. and Hilda E. GODFREY,
Plaintiffs-Appellants,

v.

The LINCOLN NATIONAL LIFE
INSURANCE COMPANY, etc., et
al., Defendants-Appellees.

Robert Kermit PINYAN,
Plaintiff-Appellant,

v.

DIXIE NATIONAL LIFE INSURANCE
CO., Defendant-Appellee.

Julian D. EDWARDS,
Plaintiff-Appellant,

v.

UNITED PRESIDENTIAL LIFE INSUR-
ANCE COMPANY, a corporation; Un-
ion Central Life Insurance Company, a
corporation; Milton L. Culver, et al.,
Defendants-Appellees.

Mary M. HUNT, Plaintiff-Appellant,

v.

UNITED PRESIDENTIAL LIFE INSUR-
ANCE COMPANY, a Corporation; Un-
ion Central Life Insurance Company, a
corporation; Milton L. Culver, et al.,
Defendants-Appellees.

Hubert A. GRISSOM,
Plaintiff-Appellant,

v.

DIXIE NATIONAL LIFE INSURANCE
COMPANY, et al., Defendant-Cross-
claim Plaintiff-Appellee.

Hoyt A. PONDER, Plaintiff-Appellant,

v.

DIXIE NATIONAL LIFE INSURANCE
CO., Lincoln National Sales Corp. of
Central Alabama & the Lincoln Nation-
al Life Insurance Co., Defendants-Ap-
pellees.

Garry Aaron WALKER,
Plaintiff-Appellant,

v.

DIXIE NATIONAL LIFE INSURANCE
CO., Defendant-Appellee.

Warren N. COOK, Plaintiff-Appellant,

v.

DIXIE NATIONAL LIFE INSURANCE
CO., Lincoln National Sales Corpora-
tion of Central Alabama & the Lincoln
National Life Insurance Company, a
corporation, Defendants-Appellees.

Burton BURDICK, Plaintiff-Appellant,

v.

DIXIE NATIONAL LIFE INSURANCE
CO., a corporation; Lincoln National
Sales Corporation of Central Alabama,
a corporation; and the Lincoln Nation-
al Life Insurance Company, a corpora-
tion, Defendants-Appellees.

Fred M. TUCKER, Plaintiff-Appellant,

v.

DIXIE NATIONAL LIFE INSURANCE
CO., Lincoln National Sales Corp. of
Central Alabama & the Lincoln Nation-
al Life Insurance Company, Defend-
ants-Appellees.

James W. SPENCER,
Plaintiff-Appellant,

v.

DIXIE NATIONAL LIFE INSURANCE
CO., a corporation; Lincoln National
Sales Corporation of Central Alabama,
a corporation, et al., Defendants-Appel-
lees.

John HAVEN, Plaintiff-Appellant,

v.

DIXIE NATIONAL LIFE INSURANCE
CO., etc., et al., Defendants-Appellees.

Allen Daniel WASHBURN & Mozelle
Washburn, Plaintiffs-Appellants,

v.

DIXIE NATIONAL LIFE INSURANCE
CO., Defendant-Appellee.

Barry W. McCOWN, Plaintiff-Appellant,

v.

DIXIE NATIONAL LIFE INSURANCE
CO., et al., Defendants-Appellees.

Eugene A. POLK, Plaintiff-Appellant,

v.

DIXIE NATIONAL LIFE INSURANCE
CO., et al., Defendants-Appellees.

Wilford R. HITT, Plaintiff-Appellant,

v.

DIXIE NATIONAL LIFE INSURANCE
CO., et al., Defendants-Appellees.

Oscar Lee NICHOLS,
Plaintiff-Appellant,

v.

ATLANTIC AMERICAN LIFE INSUR-
ANCE COMPANY, etc., et al.,
Defendants-Appellees.

Nos. 85–7140, 85–7204, 85–7457 to 85–
7464, 85–7467 to 85–7469, 85–7471
to 85–7479 and 85–7506.

United States Court of Appeals,
Eleventh Circuit.

Feb. 18, 1987.

Charles E. Sharp, Sadler, Sullivan, Sharp & Stutts, Joel A. Williams, Birmingham, Ala., for plaintiffs-appellants.

J. Gusty Yearout, Deborah Braden, Birmingham, Ala., for Wade Farmer.

William A. Robinson, Birmingham, Ala., for Dixie Nat. Life Ins. Co.

James E. Clark, Birmingham, Ala., for Atlantic American Ins. Co.

John B. Tally, Jr., Birmingham, Ala., for Union Cent. Life Ins. Co.

Before TJOFLAT and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

These twenty-three consolidated cases, each alleging fraud, come to us from the trial court's grant of summary judgment to the defendants. In some of the cases, Alabama's one-year statute of limitations for actions for fraud was the basis for summary judgment. In others, it was a release signed by the appellants; We must examine each case individually, since the propriety of summary judgment depends on the particular facts and circumstances of each case. Sufficient similarities exist, however, to warrant a single, generalized statement of facts.

## FACTS

Leamon Paul McWhorter is the central figure in these claims for fraud. He approached each of the appellants and convinced them to purchase annuity policies.[1] In most cases, he telephoned them and identified himself as an agent of an insurance company with which the particular appellant already owned a life insurance

---

1. Most of the appellants purchased Dixie National's annuities, two purchased Union Central annuities, and one purchased an Atlantic American Life annuity.

policy.[2] He told appellants that the government was forcing insurance companies to pay higher interest and for that reason appellants should take out a Dixie National[3] policy in lieu of the Lincoln policy. He told some of the appellants that the new policy would earn interest at 7% and told others that it would earn interest at 10 to 12%, .with some fluctuation.

After speaking with appellants over the telephone, McWhorter went to their respective homes, where he pretended to explain the nature of the annuities which he sold. He told them that the annuity required only an initial premium, which would earn interest on the full amount of the premium paid in. He also told them that this principal and interest would be fully available to them whenever they wished to "withdraw" their "investments," just as is the case with an ordinary savings account.

Actually, the annuities were "variable premium pension annuities" which require additional premium payments before the full amount of premium payments would become available as cash value. Contrary to McWorter's representations, these annuities did not earn interest on the full face amount of the initial premium, but earned interest only on a substantially reduced cash value. The cash value of these annuities after only one premium payment was reduced to only 20–80% of the initial premium amount because of the commissions to McWhorter and the appellee companies' initial administrative costs.[4] Although the vast majority of these annuities neither strictly required annual premium payments nor cancelled the policy for non-payment, the annuities were designed and intended for multiple contributions over a number of years. It could take up to seven years or more of the annual contributions, combined with interest accumulations, in order for an appellant's cash value to equal the amount of premiums paid. In sum, although these

appellants believed that they could withdraw the full amount of their premium, plus interest, at any time after deposit, they could withdraw as cash value, or receive as annuity payments, only 20–80% of that premium plus interest on only 20–80% of the amount of the premium paid by them.

To pay the premium for the annuities, McWhorter "stripped" appellants' old policies, that is, he convinced them either to surrender the old life insurance policy for its cash value or to borrow against it. Some of the appellants did not realize they were borrowing from or surrendering their old policies. They believed they were simply transferring the funds from one policy to another issued by the same insurance company. McWhorter told many who did borrow against their policies that they would not have to pay interest on the loans. In fact, the loans were not interest free.

The trial court provided an informative sketch of how McWhorter managed to con so many people.

> The plaintiffs point to several reasons for the extensive trust they placed in McWhorter: he possessed confidential information about the plaintiffs and their existing policies; he was knowledgeable and glib in his discussion of insurance; plaintiffs found him to be disarmingly friendly and slick in his presentation; and he allegedly capitalized upon the plaintiffs' confidence in the companies that had issued their existing life insurance policies. McWhorter won plaintiffs' confidence in his advice. They signed forms surrendering or taking loans on their existing insurance policies. They wrote checks to the defendant companies which issued the annuities (the "annuity companies"). And they signed applications for the annuities which, unless signed while still blank (as some plaintiffs allege), indicated that premium pay-

---

**2.** Most of the appellants owned a Lincoln National life insurance policy.

**3.** As we noted, three of the appellants were sold annuity policies from the other two appellees.

**4.** In most cases, the cash value after the first premium payment was less than one-half of the premium payment. Contributions paid after the first year added to the cash value at a rate of 80–95% of each contribution.

ments would be made annually. However, plaintiffs claim that because they trusted McWhorter, they did not read or attempt to understand the applications, but simply signed where he instructed them. McWhorter explained that additional premiums were optional, that plaintiffs could contribute more money to their annuities at any time, as a very few plaintiffs did, but that no further contributions were required in order for plaintiffs to be able to withdraw their full premium payments plus interest. In addition, at or near the time of sale McWhorter warned many of the plaintiffs that they would later be receiving premium notices from the annuity companies. He stated that these notices could be ignored since all further premium payments were strictly optional. Virtually all the plaintiffs in fact did receive at least one premium notice more than a year prior to filing suit; those who had not been forewarned by McWhorter—and some who had been—typically called McWhorter and were assured by him that the notice was simply a reminder that they had the option to contribute more to the annuity.

Most of the appellants claim that they did not learn of McWhorter's fraud until they were visited by Horace O'Neal, an attorney for Dixie National. O'Neal informed the appellants of McWhorter's misrepresentations, refunded their full initial premium, and secured their signature on releases. Some of the appellants claim O'Neal misrepresented the releases as receipts and importuned them to sign.

Appellants filed suit in the Circuit Court of Jefferson County, Alabama, alleging fraud. Subsequently, McWhorter filed for

protection under federal bankruptcy laws. Shortly thereafter, Dixie National filed suit in bankruptcy court, naming McWhorter and other parties, to secure a determination that McWhorter was liable to it and that this liability was not dischargeable in bankruptcy. The state court suits were removed to the bankruptcy court, which transferred them to federal district court.

The district court denied appellants' motion to remand to state court and ordered the cases consolidated. Appellants challenge this denial of their motion to remand as well as the grant of summary judgment.

## ISSUES

Although there are 23 plaintiffs, we must resolve three basic questions:

1. Whether the trial court's denial of appellants' motion to remand to state court is reviewable on appeal.

2. Whether the trial court erred by granting summary judgment on the basis of the releases and the related basis of accord and satisfaction.

3. Whether the trial court erred by granting summary judgment on the ground that appellants should have discovered the fraud more than one year prior to the date these actions were filed.

## DISCUSSION

I. *Motion To Remand*

■ It is clear that by virtue of 28 U.S.C. § 1478(b), a decision not to remand is not reviewable on appeal.[5] Indeed, counsel for appellants conceded as much at oral argument. Since we have no jurisdiction to review this claim, we turn to consider those claims properly before us.

---

5. 28 U.S.C. § 1478(a) provides:

A party may remove any claim or cause of action in a civil action, other than a proceeding before the United States Tax Court or a civil action by a Government unit to enforce such government unit's police or regulatory power, to the bankruptcy court for the district where such civil action is pending, if the bankruptcy courts have jurisdiction over such claim or cause of action.

28 U.S.C. § 1478(b) provides:

The court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground. *An order under this subsection remanding a claim or cause of action, or a decision not so remanding, is not reviewable by appeal* or otherwise. (emphasis added.)

The current version of § 1478(b), contained in 28 U.S.C. § 1452(b) contains essentially the same language.

## 1566

### II. *Release*

Two grounds were relied on by the trial court in its grant of summary judgment on the basis of the releases: failure timely to return the consideration, and failure to allege facts amounting to legal fraud.

### A. *Timely Return of Consideration*

In granting summary judgment on this basis, the trial court cited *Hinds v. Plantation Pipe Line,* 455 F.2d 902, 906 n. 5 (5th Cir.1972), for the proposition that to avoid a release because of fraud, and sue on the underlying action, one must return the consideration within a reasonable time after discovery of the fraud. The court also cited *Louisville and Nashville Ry. Co. v. Spurgeon,* 272 Ala. 197, 129 So.2d 682 (1961), for the proposition that the consideration must be returned within a reasonable time after the defense of release is placed in issue.

Applying this law to the facts before it, the trial court held that appellants' offer to return the consideration on January 25, 1984, was "patently unreasonable," since the release issue was raised by Dixie National's answer on September 23, 1983, and since it had been briefed by the time the consideration was tendered.[6]

The proper starting point for countdown to determine whether the tender was timely is September 23, 1983, when the release was first placed in issue. *See Louisville and Nashville Ry. Co. v. Spurgeon,*[7] 272 Ala. at 199, 129 So.2d at 684 (countdown begins when release raised as defense; plaintiff need not anticipate pleading of release as affirmative defense) (cited with approval in *Boles v. Blackstock,* 484 So.2d 1077, 1083 (Ala.1986)).

Once countdown begins, timeliness of tender ordinarily is a question for the jury. *McCoy v. Prince,* 11 Ala.App. 388, 66 So.

950 (1914). We realize, however, that "[t]o say that an issue is a jury question is not to say that the issue should go to the jury in all instances," *Carroll Kenworth Truck Sales v. Kenworth Truck Co.,* 781 F.2d 1520, 1526 (11th Cir.1986), but it is to say that "[if] reasonable minds might differ on the inferences arising from undisputed facts, then a court should deny summary judgment," and allow the issue to be resolved by the trier of facts. *Mercantile Bank & Trust v. Fidelity & Deposit Co.,* 750 F.2d 838, 841 (11th Cir.1985) (citations omitted).

In other words, unless we can say that reasonable minds could not differ on whether the four month interval between the time the release was placed in issue and the time the consideration was tendered constitutes an unreasonable delay, then we must reverse.

We have found only one reported case where an Alabama court has held as a matter of law that tender was untimely. *See Kelly v. Louisville & Nashville Ry. Co.,* 154 Ala. 573, 45 So. 906 (1908) (consideration tendered three years after release pled and after case fully tried and reversed by appellate court). If such were the case here, we would agree with the sentiment of the trial court that "[t]he plaintiffs waived their right to claim fraud in the inducement by retaining the benefits of the releases while seeking to avoid their burdens," (citing *Jehle-Slauson Constr. Co. v. Hood-Rich, Arch. and Consulting Eng.,* 435 So.2d 716 (Ala.1983). As it is, we cannot agree.

 In *Jehle-Slauson Constr. Co. v. Hood-Rich, Arch. and Consulting Eng.,* the plaintiffs *never* offered to return the consideration. The appellants did. Furthermore, it does not seem to us that a four

---

**6.** The court also noted that the appellants discovered the alleged fraud in the procurement of the releases when they conferred with their attorneys in April to June of 1983.

**7.** In that case, the release was executed on September 8, 1955. The complaint, accompanied by interrogatories which made specific inquiry

about the release, was filed on November 22, 1955. The defendants answer on April 23, 1956 and on December 4, 1956 announced that they would plead the release as a defense. On December 6, 1956, plaintiffs offered to return the consideration. The Alabama Supreme Court held the tender timely.

month delay was, as the trial court stated, "patently unreasonable." We believe a determination of the fact of the reasonableness of the delay should include a consideration of appellants' doubts as to whether Dixie National would accept a return of the consideration, and appellants' reliance on *Mutual Life Ins. Co. v. Osborne*, 30 Ala. App. 399, 7 So.2d 314 (1941), 245 Ala. 15, 15 So.2d 713 (1943), for the proposition that in the case of insurance contracts, a plaintiff need not return the consideration before seeking to rescind the release.[8] Even without these factors, we would doubt that four months is a "patently unreasonable" delay. With them, we are convinced it is not.

### B. *Fraudulent Inducement*

When the execution of a written instrument is obtained by misrepresentation of its contents, and a party is induced by such fraud to sign an instrument he did not know he was signing, and which he did not really intend to sign, the party so defrauded can avoid the effect of his signature, because of the fraud practiced upon him, notwithstanding he may have neglected to read the instrument or to have it read to him. *Butler Cotton Oil Co. v. G.H. Campbell & Son*, 16 Ala.App. 445, 78 So. 643, 644 (1918).

▇▇ Indeed, under Alabama Code § 6–5–101 (1975): "Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted upon by the opposite party, constitute legal fraud." *See Kennedy Elec. Co. v. Moore-Handley, Inc.*, 437 So.2d 76, 80 (Ala.1983) (misrepresentation of material fact, when detrimentally relied on, constitutes fraud). Under § 6–5–101, where there is evidence reasonably affording an inference that a plaintiff was defrauded, the case is one for the trier of fact. *Stinson v. Adams*, 376 So.2d 1108, 1110 (Ala.1979).[9]

### FUNDABURK, POLK, AND HITT

Appellants Fundaburk, Polk, and Hitt[10] seek to rescind the releases which they signed on the basis that O'Neal, a lawyer for Dixie National, misrepresented them as receipts. In the case of Fundaburk, O'Neal stated that Dixie did not owe him any money but was acting "out of the goodness of its heart," and that the "receipt" was just to show that money was being put back in his policy. The form which Fundaburk signed was entitled "Application for Increase in Cash Value and General Release."

About a month after O'Neal's visit, Fundaburk received a letter from Jerry Greer, Vice President of Dixie National. In the letter, Greer discussed the increase in cash value, but made no mention of a release. Enclosed in the letter was an endorsement for Fundaburk to sign showing that his cash value was being increased by $729.83.

Fundaburk testified in his deposition that although O'Neal did not prevent him from reading the document, he held it on his briefcase, gave him a pen, and said "Sign here, sign down at the bottom."

Appellants Polk and Hitt signed documents entitled "Application for Cancellation and Return of Premium Payments and General Release." Both appellants testified in their depositions that O'Neal described the document as a receipt showing that they had surrendered their policies in return for premiums paid. According to appellant Polk, he saw no need to read the document because he "was taking him

---

8. We do not mean to suggest that we agree with appellants' argument that tender was unnecessary because Dixie National would not have accepted it or because *Osborne* provides an exception in insurance cases, but we do believe that these are factors to be considered by the jury when determining the reasonableness of the delay.

9. In an Alabama court, a plaintiff can defeat a motion for summary judgment by presenting a "scintilla of evidence." *Studdard v. South Central Bell Tel. Co.*, 356 So.2d 139 (Ala.1978). In federal court, however, more than a scintilla of evidence is required. *Walker v. American Motorists Ins. Co.*, 529 F.2d 1163 (5th Cir.1976).

10. These three cases were decided after the others. The trial court did not base summary judgment on failure timely to return the consideration.

[O'Neal] at his word ... that he was doing something good for me."

In granting summary judgment on the basis of the releases, the trial court held, as to Fundaburk and Polk, that they were not prevented from reading the releases before they signed, and thus the releases, as well as the doctrine of accord and satisfaction, barred their claims. As to Hitt, the court merely stated that the suit was barred by the release and accord and satisfaction. We reverse.

■ Apparently in dealing with these cases, the trial court was of the view that in order for appellants to prevail on their claim that the releases were procured by fraud, they must show that they were prevented from reading the releases. That, however, is not the law in Alabama.[11]

In *Rudman v. Hooks*, 252 Ala. 280, 40 So.2d 866 (1949), the Alabama Supreme Court affirmed the lower court's holding that a lease was procured by fraud when the lessee who drew the lease misrepresented its contents. The plaintiff lessor signed the lease without reading it. The plaintiff neither alleged nor was required to allege that he was prevented from reading the lease.

In the other cases, aside from these three, in which the trial court granted summary judgment on the basis of the releases, it held that there was no fraud because appellants should have been wary of O'Neal after their dealings with McWhorter.

This may ultimately be found to be true in those cases, and here as well. We are satisfied, however, that it is not true as a matter of law. *See James v. Handley*, 267 Ala. 241, 101 So.2d 76, 78 (1958) (existence of legal fraud depends on particular facts and circumstances of each case.)

To be suspicious of O'Neal merely because he, like McWhorter, worked for Dixie National would be inconsistent with the adage that "one bad apple doesn't spoil the whole bunch." As the old Fifth Circuit stated, "a party is not required to presume fraud or suspect it until something comes to him leading a just person to suspect fraud and make inquiry." *Mann v. Adams Realty*, 556 F.2d 288, 295 (5th Cir.1977).

After all, it was O'Neal who revealed to these three appellants that McWhorter had deceived them. Moreover, a cursory look at the heading of the documents they signed would not necessarily have revealed that they were inconsistent with O'Neal's representation.[12]

■ Whether appellants, in light of their prior dealings with a Dixie National representative, and other relevant circumstances,[13] should have been wary of O'Neal, and thus read the document he represented as a receipt, is the type of question which seeks to compare appellants' conduct with that of other ordinary, reasonable persons, in like positions. This kind of comparison is left to the arbiters of reasonableness in human affairs, the jury. Thus, we reverse these and other cases where the releases were misrepresented as receipts. Walker, Russell Pinyan, Robert Pinyan, Godfrey, and Washburn.[14]

---

**11.** Indeed, in its discussion of the statute of limitations, the trial court acknowledged that a party may avoid the implications of signing a document when defrauded into signing it by misrepresentations as to its content. Such was the case here.

**12.** In the case of Fundaburk, O'Neal said the document was a receipt to show that the cash value of his policy was being increased. The document was captioned "Application for Increase in Cash Value and General Release." O'Neal told Polk and Hitt the "receipt" was to show that their policy was being cancelled and their premiums returned. These documents were entitled "Application for Cancellation and

Return of Premium Payments and General Release."

**13.** In *Sparks v. Rack Service Company, Inc.*, 489 F.2d 480, 481 (5th Cir.1974) (per curiam), the Court, in affirming the jury's finding that plaintiff's reliance on certain misrepresentations was justified, considered the misrepresenter's position or status, along with the plaintiff's education and experience in the subject matter of the misrepresentation.

**14.** The trial court also granted summary judgment on the basis of accord and satisfaction. Accord and satisfaction requires a meeting of

**COOK, TUCKER, SPENCER, McCOWN, HAVEN, AND BURDICK**

In these six cases, the trial court granted summary judgment solely on the basis of the releases. In light of our conclusion that the delay in tendering the consideration was not unreasonable as a matter of law, we must now examine the facts as to each appellant to determine whether there is sufficient evidence of fraudulent inducement to put the trial court in error.

## COOK

Appellant Cook testified in his affidavit that O'Neal told him that he needed to sign a piece of paper in order for the money to be put back in his policy. In his deposition, he testified that he does not remember whether he read the entire document but does remember reading the first paragraph. The document in question, entitled "Application for Increase in Cash Value and General Release," was sent to appellant in the mail along with a letter from Dixie National's Senior Vice President, Mr. Greer. The letter referred to the document by name.

The first paragraph of the release, which appellant did read, states:

> In consideration of and exchange for the return of all premium payments made on Policy Number *UP–26805* issued on the life of *Gary Aaron Walker,* said policy is hereby surrendered for cancellation. The complete release and discharge set forth herein is in favor of Dixie National Life Insurance Company, its officers, directors, and agents.

Aside from claiming that O'Neal told him he needed to sign a paper showing his cash value was being increased, appellants' main argument that the release was procured by fraud is that O'Neal did not tell him that other customers had been defrauded by

the minds. *Ray v. Alabama Cent. Credit Union,* 472 So.2d 1012, 1014 (Ala.1985). Where there is fraud, however, there is no meeting of the minds. *White v. Great Am. Ins. Co. of New York,* 343 F.Supp. 1112, 1119 (M.D.Ala.1972).

McWhorter and that Dixie had been sued as a result.

The first paragraph of the release clearly identified it as such, notwithstanding any earlier representations by O'Neal. Moreover, when appellant received the release in the mail and read the first paragraph, O'Neal was not present. Thus, he was not the victim of even subtle pressure. The question then boils down to whether O'Neal's failure to inform appellant that others had been defrauded by McWhorter and that Dixie had been sued over his dealings constitutes fraud so as to avoid the release.

We begin with the proposition that in arms length dealings, there is no duty to disclose unrequested information. *Nobility Homes, Inc. v. Ballentine,* 386 So.2d 727, 730 (Ala.1980) (per curiam). Indeed:

> [Alabama] cases seem to hold that when both parties are intelligent and fully capable of taking care of themselves and dealing at arms length, with no confidential relations, that no duty to disclose exists when information is not requested, and that mere silence is then not a fraud....

*Mudd v. Lanier,* 247 Ala. 363, 377, 24 So.2d 550, 562 (1946).

To establish fraud by silence, one must aver facts from which a duty to speak arises and from which it appears that the parties were not dealing at arms length. *Tonsmeire v. Tonsmeire,* 285 Ala. 454, 233 So.2d 465, 468 (1970). The existence of a duty to disclose is a legal question, *Berkel & Co. Contractors v. Providence Hosp.,* 454 So.2d 496 (Ala.1984); *Hand v. Butts,* 289 Ala. 653, 270 So.2d 789 (1982), to be discerned "from the confidential relations of the parties or from the particular circumstances of the case." Ala. Code § 6–5–102 (1975).[15]

15. Ala.Code § 6–5–102 provides that: "Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."

To make this determination, Alabama courts have examined the (1) relationship of the parties, (2) value of particular facts, and (3) relative knowledge of each party. *Berkel & Co. Contractors v. Providence Hosp.*, 454 So.2d at 506; *Jim Short Ford Sales, Inc. v. Washington*, 384 So.2d 83, 86, 87 (Ala.1980).

"Where the accused has superior knowledge of the suppressed fact and the defrauded party has been induced to take action which he might not otherwise have taken, the obligation to disclose is particularly compelling." *Mann v. Adams Realty Co.*, 556 F.2d 288, 297 (5th Cir.1977) (citing *Chapman v. Rivers Construction Co.*, 284 Ala. 633, 227 So.2d 403, 410–13 (1969)).

The former Fifth Circuit observed that "the type of relationships wherein a duty to disclose has been found indicate that the Alabama courts give little attention to the designation of the relationship, such as vendor-vendee, etc., but instead look to the relative bargaining position of the parties." *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1313 (5th Cir. 1977). This summary has been cited with approval by the Alabama Supreme Court. *Jim Walter Homes, Inc. v. Waldrop*, 448 So.2d 301, 305 (Ala.1983) (per curiam); *Jim Short Ford Sales, Inc. v. Washington*, 384 So.2d 83, 87 (Ala.1980).

The existence of a duty to disclose depends on the particular facts and circumstances of each case. *Coosa Valley Bank v. Taylor-Holmes Indus*, 420 So.2d 51, 54 (1982) "[A] rigid approach is impossible and indeed, the words of [§ 6–5–102] itself counsel flexibility." *Jim Short Ford Sales, Inc. v. Washington*, 384 So.2d at 86.

Here, Dixie National sent out a letter announcing O'Neal's visit and asking appellants for their help in evaluating customer satisfaction. The letter stated:

We need your help! We are in the process of contacting some of our Alabama policy-owners to evaluate their satisfaction. In this regard, we have asked Mr. Horace O'Neal to contact you in the near future on behalf of the Policyowner Service Department of Dixie National Life.

We need your feedback so we can make sure you are a satisfied policyowner. So please take a few minutes to talk with Mr. O'Neal when he calls. If you have any complaints or questions, Mr. O'Neal will resolve them if possible. He will not try to sell you any additional insurance. Your cooperation will assist Dixie National Life Insurance Company in better serving you.

Thank you.

Sincerely,

/s/ Robert B. Neal

When O'Neal arrived, he told the appellants that Dixie had done nothing wrong and was refunding their money "out of the goodness of its heart." He did not tell them that Dixie had been sued because of this policy. Nor did he tell them that numerous other customers had been defrauded by McWhorter. He offered them the option of keeping their policy and increasing their cash values or canceling their policy and getting a full refund of premiums paid.

In *Jim Walter Homes, Inc. v. Waldrop*, 448 So.2d 301 (Ala.1983) (per curiam), the court held that a seller had a duty to disclose to a buyer that there was a pending lawsuit concerning the property for sale. In finding a duty, the court held that vendor's knowledge of the litigation and the vendee's possibly inferior bargaining position was sufficient to impose a duty to disclose. *Id.* at 306.

In *State Farm Mut. Auto. Ins. v. Ling*, 348 So.2d 472 (Ala.1971), the court held that the insurer had a duty to disclose to the insured that his claim was subject to a one year statute of limitations when the insurance company represented the plaintiff and the other party to the accident and when the agent had lulled the plaintiff into inaction by telling him the insurance company would take care of everything.

■ Like the plaintiffs in *Waldrop*, the appellants here were in an inferior bargaining position, and like the defendants there, Dixie National and O'Neal were well aware of the other lawsuits. Moreover, O'Neal

attempted to gain the appellant's confidence by telling them that Dixie National was acting out of the goodness of its heart and in an effort to maintain its good name. Although this does not rise to the lulling in *Ling,* it is nonetheless an attempt to win appellants' confidence, which when won, imposes a corresponding duty of fair dealing. *See Ling,* at 475 (agent's engendering of trust and confidence imposes duty to disclose material facts).

Even if Dixie National were under no duty to tell appellants of McWhorter's fraud and of the other lawsuits,[16] once it undertook to speak, it was required to make a full and fair disclosure. *First Virginia Bankshares v. Benson,* 559 F.2d at 1313 (citing *Jackson Co. v. Faulkner,* 55 Ala. App. 354, 315 So.2d 591 (1975)). Thus, we hold that Dixie National was under a duty to disclose all material facts, but we leave for later disposition the question whether the facts which were not disclosed were material. *Jim Walter Homes, Inc. v. Waldrop,* 448 So.2d at 305; *Courtesy Ford Sales, Inc. v. Clark,* 425 So.2d 1075 (Ala. 1983).

### TUCKER

Unlike appellant Cook, Tucker did not read the document. He testified in his deposition that as he was about to read it, O'Neal stated, "Well, I see Mr. Tucker he reads, that he has got to where he reads things before he signs it." Tucker then responded, "Well, I guess this is just a showing that I got my check." O'Neal did not respond. Appellant took his silence to be an affirmation and thus did not read the document. We reverse. *See* discussion to Fundaburk, Polk, and Hitt, *supra.*

### SPENCER

Appellant knew the document he signed was a release but argues he did not know that others had been defrauded by McWhorter and that he did not know about

Dixie's involvement. In light of our conclusions as to appellant Cook, we reverse.

### McCOWN

Appellant testified by way of affidavit that O'Neal explained the document as a "release from insurance" showing that he was giving up his policy. According to O'Neal, appellant had to sign the document because he did not have his policy with him at the time.

Appellant testified that he looked at the document but just signed where O'Neal pointed. He thought the document was like a receipt for the check. In his deposition, he stated, "As I understood it, this was a release from insurance; that they were giving me my premiums back; I was giving them their insurance back. I didn't have a policy to surrender, so I had to sign something. I mean, that was in my head."

We cannot determine whether O'Neal misrepresented the document or whether appellant simply misunderstood the representations made. To resolve this kind of question is the very reason juries are empaneled. We, therefore, reverse the grant of summary judgment and leave this question for them.[17]

### HAVEN

Like appellant Cook, Haven received the release through the mail without any representations from O'Neal that it was a receipt. Appellant testified in his deposition that he definitely read some of the document and probably read all of it. We reverse the grant of summary judgment because of the reasons discussed as to appellant Cook.

### BURDICK

Like appellants Cook and Haven, Burdick read the release and understood it to be such, but was not informed of the wide-

---

**16.** This case differs from those cases where it was held that there was no duty to disclose a cause of action. A fact of a lawsuit is not a cause of action.

**17.** We also reverse on the grounds of O'Neal's failure to make full disclosure.

spread nature of McWhorter's fraud or of the prior lawsuits. We reverse for the reasons discussed in those cases.

We also reverse the grant of summary judgment against the other appellants to whom O'Neal failed to disclose the fact of prior lawsuits. Ponder, Fowler, and Bone.

### DOMINICK AND JOHNSON

Appellants signed a release different in form than in the other cases. Both appellants signed a document entitled "Application For Cash Surrender Value." These documents stated in part, "Said Surrender Value is accepted in full settlement and complete satisfaction of all rights, claims, and demands under said policy."

■ This release bars only contract actions arising under the policy. Actions for fraud and deceit are tort actions which do not arise under the policy.[18] They are separate and distinct causes of action. *Carolina Casualty Insurance Company v. Tisdale*, 237 So.2d 855, 859 (Ala.Civ.App. 1970).[19] We therefore reverse.

### III. *Statute of Limitations*

The trial court dismissed all of these cases, except the six discussed in the prior section, on the grounds that they were barred by the statute of limitations.

Section 6–2–39, Code of Alabama (1975), requires that all actions for fraud be commenced within one year of the fraud. Section 6–2–3 operates as a savings clause. It provides that a claim for fraud "must not be considered as having accrued until discovery by the aggrieved party of the fact constituting the fraud, after which he must have one year within which to prosecute his action." Under this statute, one discovers fraud when one ought to discover fraud, which is "at the time of the discovery of facts which would provoke inquiry by a person of ordinary prudence and which, if

followed up, would have led to the discovery of the fraud." *Papastefan v. B & L Constr. Co. of Mobile*, 385 So.2d 966, 967 (Ala.1980).

A party who seeks to have his cause of action saved by Section 6–2–3 carries the burden of proving that he falls within it. *Walker v. American Motorists Ins. Co.*, 529 F.2d 1163, 1165 (5th Cir.1976); *Seybold v. Magnolia Land Co.*, 376 So.2d 1083, 1085 (Ala.1979). In other words:

When a party relies on his ignorance of facts material to his right as an excuse for his laches and delay in asserting them, he must show by distinct averment why he was so long ignorant, and acquit himself of all knowledge of facts which would put him on inquiry, and must show how and when he first acquired knowledge of the facts.

*Johnson v. Shenandoah Life Ins. Co.*, 291 Ala. 389, 281 So.2d 636 (1973) (citations omitted).

The Supreme Court recently has stated that the standard of proof which applies to a substantive claim applies as well on motion for summary judgment, *Anderson v. Liberty Lobby, Inc.*, — U.S. —, —, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), and that summary judgment should be granted where the evidence is such that it would require a directed verdict for the moving party. *Id.* — U.S. at —, 106 S.Ct. at 2511 (citing *Sartor v. Arkansas Gas Corp.*, 321 U.S. 620, 624, 64 S.Ct. 724, 727, 88 L.Ed. 967 (1944). With this in mind, we consider the facts as to each appellant.

### FUNDABURK

In 1977 and 1978, appellant received documents from Lincoln National which referred to indebtedness and repayment. McWhorter had not informed appellant that

---

**18.** In the other cases, Dixie changed this form and entitled it "Application For Cash Surrender Value and General Release." That document bars all action, "... under or in connection with said policy, the application for and issuance of said policy, or the purchase of said policy."

**19.** We reject appellees' argument that the action is bound by accord and satisfaction. There is no evidence that the parties contemplated a comprehensive release.

he had actually borrowed against his Lincoln policy. According to the trial court, these documents constituted notice of fraud.

■ We disagree. The documents referred only to the Lincoln policy, not the Dixie National annuity. As the trial court recognized, "[t]he most damaging aspect of the fraud occurred in McWhorter's misrepresentation of the nature of the [Dixie National's] annuities which he sold." The documents from Lincoln National shed no light on the true nature of the Dixie National annuity.

The question, then, is whether the documents would have led a reasonable person to become suspicious [20] of McWhorter's general honesty, such that he would inquire about the Dixie National annuity. *Mann v. Adams Realty Co.*, 556 F.2d 288, 295 (5th Cir.1977); *Papastefan v. B & L Constr. Co. of Mobile*, 385 So.2d 966, 967 (Ala.1980). More specifically, the question is to be asked concerning a reasonable man in whom a "smooth talker" has engendered confidence.[21] Thus posed, the question is difficult to answer, surely to elicit from some a yes, from others a no, and thus from us a directive to refer it to the jury, as we do not believe that these documents, which did not concern the gravamen of the fraud, should have, as a matter of law, aroused appellant to make inquiry. We do not believe appellees would be entitled to a directed verdict. Thus, we reverse.

### POLK AND HITT

■ Appellants concede that they learned of McWhorter's fraud in the summer of 1982, more than one year before they filed suit, but argue that they did not learn of Dixie National's separate and distinct fraud until later. The evidence which appellants claim shows Dixie National's separate fraud are attached as exhibits to their brief. They were not, however, presented to the trial court prior to the grant of summary judgment. We therefore refuse to consider them.[22] Affirmed.

### CASHED OUT POLICIES: DOMINICK, JOHNSON, AND WALKER

The trial court granted summary judgment against appellants Dominick, Johnson, and Walker who cashed out their policies more than one year prior to filing suit. The court concluded that at the time they cashed out their policies they became "actually" aware of the inconsistency between their true cash values and McWhorter's representations. We believe this is true as to appellants Walker and Johnson, but not appellant Dominick.

### DOMINICK

■ Appellant testified in his deposition that, although initially he had difficulty getting his money back, he was never aware that his cash value was less than the $1,000 he invested. Since we have found nothing in the record to contradict this testimony, we reverse.

### JOHNSON

■ Appellant received a letter from Dixie National dated 11/10/78 disclosing the cash value of his $1,000 premium as $217. A few days later, McWhorter visited appellant and told him that he misunderstood the policy, but that McWhorter would help him get his money back. A few weeks later, McWhorter brought him a check for $1,000. Appellant testified that after he received the letter, he understood that un-

---

**20.** We pose the question this way because there is no evidence that Fundaburk actually became suspicious.

**21.** The trial court found that all of the appellants were lulled into not reading their annuity policies. We accept this finding and the court's reading of Alabama law to reject appellee's argument that the fraud would have been discovered if appellants had read their policies. The trial court stated, "[i]t should be noted that, in cases of alleged fraud, no reported Alabama decision has ever employed this 'duty to read' rationale in order to commence the running of the statute of limitations at the time of receipt of an insurance policy."

**22.** We also decline to consider similar exhibits attached to the briefs of the other appellants.

der the terms of the policy he was entitled to $217. He argues, however, that he thought he misunderstood the policy, not that McWhorter had misrepresented it.

Regardless of how it is phrased, appellant knew and understood his cash value in 1978. Affirmed.

## WALKER

In the process of cashing out his policy, Walker told Mr. Varner, Vice President of Dixie National that McWhorter had lied to him and misrepresented the policy. He was clearly aware of the fraud more than one year before filing suit. Affirmed.

## PERSONALIZED STATEMENT OF CASH VALUE

## BONE, FOWLER, RUSSELL PINYAN, AND WASHBURN

The trial court granted summary judgment in some cases because appellants received either oral or written statements disclosing the true cash value of their annuities more than one year prior to filing suit.

## CARLTON AND CHRYSTLE BONE

Appellants' letter disclosing cash value came in the following context. In about 1977 or 1978, appellants discovered that McWhorter had not informed them that they were borrowing from their Lincoln policy and would have to pay interest. Appellants told McWhorter that they wanted their money back, but McWhorter apparently told them they could not get it, and that they did not have enough money to sue.

On March 30, 1982, appellants wrote a letter to Dixie National complaining that McWhorter did not tell them they were borrowing against the Lincoln policy. In the letter, Mrs. Bone stated, "Now I know we should have been smarter but when *you* are dealing with a smart operator you don't always think." (Emphasis in original).

Mr. Bone talked with Mr. Varner on the telephone and explained that McWhorter told them they could get all their money at any time. Varner told appellant the cash value of the policy was only $400. He sent a letter dated 4/15/82 to this same effect. Appellants filed suit May 13, 1983.

We believe this case is distinguishable from *American Pioneer Life Insurance Company v. Fred Sandlin Execution of the Estate of E. Kenneth Ayres*, 470 So.2d 657 (Ala.1985). There, the Alabama Supreme Court held that a letter to the plaintiff which disclosed his cash value did not put him on notice of fraud as a matter of law. The court held that the letter was addressed principally to the need for additional premiums, and made a single reference to cash value. McWhorter had told plaintiff to disregard letters requesting premiums. This, in light of plaintiff's age, 70, and inexperience with insurance, made it a question for the jury. *Id.* at 663.

■ Here, appellants were first orally informed of their cash value. Then, this amount was confirmed in a letter addressed principally to this subject. Finally, both references occurred after appellants already had begun to be suspicious of McWhorter.[23] On these facts, we affirm.

## FOWLER

The court granted summary judgment based on the receipt of documents indicating true cash value and unexpected interest bills. In response to an inquiry from Fowler concerning the value of his policy, Dixie sent a letter indicating that appellant's cash value was $782.36 based on a deposit of $2,900. Appellant testified in his deposition that he was interested in how much money he had earned in interest, not how much he could get if he wanted to cancel the policy. He viewed the letter as unresponsive to his question.

In June, 1982, appellant received a computer printout from Dixie showing his true

**23.** We take Mrs. Bone's reference to McWhorter as a "smart operator" to be an allusion to his skill as a conman rather than his intellectual capacity.

cash value. The form also showed he had earned only $42.48 in interest.

Even if the letter from Dixie was unresponsive to the precise question posed by appellant, it did relate to the value of his policy, as did the computer printout. *See* discussion of appellant Bone, *supra*. Affirmed.

### WASHBURNS

In 1976, Allen and Mozelle Washburn each purchased a Dixie National annuity IRA policy for $944.40. When the statements which appellants received from Dixie National did not show the amount of interest they had earned, they called McWhorter to find out why. McWhorter assured them that their policies were earning interest. They also received premium notices, which they had not expected.

In about February of 1982, Mrs. Washburn wrote to Dixie and asked how much interest their policies had earned and if the accounts were now drawing 12% interest.

In a letter dated February 19, 1982, Dixie informed appellants of their interest and cash value. The first two paragraphs of the letter stated:

> In response to your letter regarding the above referenced IRA accounts, policy 26577 has been paid up for $1800 Face Amount since November 1, 1978. This policy has a current value of $1,179.68 plus accumulated dividends of $32.44 for a total of $1,212.12.
>
> Variable Premium Annuity VP–26651 for Mr. Washburn has a Cash Value and earned interest totalling $255.35 on a single deposit of $944.40. The Variable Premium Annuity VP–26695 for Mrs. Washburn has a total cash value and interest of $254.89 based on a single deposit of $944.40.

The third paragraph explained how cash value was calculated as 20% of premium and that present cash value was earning interest at 6.25%.

Mr. Washburn does not recall whether he read the third paragraph. Mrs. Washburn testified that she did not read it. Appellants testified that they interpreted the first two paragraphs as stating that they had a cash value of $944.40 and earning interest of $255.35 based on a single deposit of $944.40.

Although the trial court recognized that the cash value notification was "somewhat ambiguous," it stated that if appellants could not understand the statement, they had the duty to inquire further. The court also held that even assuming that their interpretation of the statement was reasonable, they should have been put on notice by the implications of the statement. According to the court, a calculation of interest at 12% would yield $600.00, not $225.00. The court cited *Sexton v. Liberty Life Ins. Co.*, 405 So.2d 18, 21 (Ala.1981), for the proposition that where a simple percentage calculation would have revealed insurance fraud, the statute runs from the time the calculation could have been performed.

In *Sexton*, the Alabama Supreme Court affirmed the grant of summary judgment on the basis of the statute of limitations. An agent for the defendant represented to the plaintiff that her policies paid 80% of the medical expenses. In fact, the policy paid a fixed daily rate. In July 1975, one policy paid $15.00 on a $125.00 surgical bill. In June 1977, both policies paid a total of $448.00 on expenses of $746.14. In July 1978, the insured was injured and incurred expenses of $11,280.12. The defendant insurance company issued a draft of $1,520.00 and plaintiff complained that this was insufficient.

The court held that the payments in July, 1975 and June, 1977, which were only about 60% of the expenses, put appellant on notice of fraud, because she had only to perform a simple mathematical calculation to determine that it was less than 80%. The court concluded: "We reject Mrs. Sexton's contention that she was not put on notice of the fraud because the payments were de minimus. We note particularly that the alleged underpayments were made on two separate occasions."

We reject appellant's effort to distinguish *Sexton* on the basis that any discrepancy was more likely to be discovered in that case since it involved out-of-pocket expenses. Appellants specifically asked if their accounts were earning interest at 12%. Having asked the question, they acted unreasonably in not looking to the letter for the answer which was spelled out clearly less than an inch from the paragraph they admit to reading. Affirmed.

## RUSSELL PINYAN

In December of 1977, McWhorter convinced appellant that he needed some more insurance in addition to the Woodmen of the World policy that his father bought for him. He took $750 from the policy and invested in a Dixie annuity. McWhorter told him that he could borrow the money without having to pay it back and that it would not jeopardize his policy.

Appellant did not read the Dixie annuity when he received it. Soon after receiving it, he also received a letter stating that his Woodmen policy had been cashed out and surrendered and that he was no longer insured with Woodmen. Somewhat confused, appellant called McWhorter and told him about the letter. McWhorter said that he would handle it. About a month later, McWhorter admitted that he couldn't correct the mistake, but assured plaintiff that the Lincoln policy that he had was better than the cancelled policy.

In March of 1980, appellant got married and decided to get his money out of the Dixie policy in order to buy a house. McWhorter told appellant that there might be a small penalty but he would see how much appellant could get.

Appellant received a letter from Dixie dated October 27, 1980, indicating a cash value of $169.32 on a deposit of $750.00.

Appellant testified that he later called Dixie about the letter. He talked to a Mr. Frank Sleeper, Dixie National's IRA admin-istrator. Appellant claims that Mr. Sleeper told him that he could only withdraw the $169.32 in interest, but that the principal sum of $750 remained, earning further interest. In Dixie's version of the conversation, the $169.32 is not referred to as interest. In any event, appellant decided not to withdraw his money.

The trial court held that the October 27 letter indicating cash value and the circumstances surrounding the cancellation of his Woodmen policy put him on notice of fraud.

Accepting, as we must on a motion for summary judgment, appellant's version of the telephone conversation with Mr. Sleeper, we are left with the cancellation of the Woodmen policy.[24] In light of McWhorter's assurance that the new policy was better than the one cancelled, we do not believe that the cancellation of the policy was sufficient to put appellant on notice of fraud. Reversed.

## CASH VALUE REPORTED ON FORMS

### GODFREY, ROBERT PINYAN, EDWARDS, AND HUNT

These appellants did not specifically inquire about the value of their policies but received computer generated form letters indicating their cash values.

### GODFREY

In about 1978, Mr. and Mrs. Godfrey received a letter from Lincoln National showing that they owed a principal amount plus interest. McWhorter advised them to ignore the notices and that he would take care of everything. At appellant's deposition they produced 11 premium notices from Dixie National, dating back to April of 1979. They also received a form letter disclosing the current status of the policy. Appellants did not read the letter because McWhorter said he would take care of everything.

---

**24.** Mr. Sleeper's explanation of the October 27th letter would settle any concerns that appellant may have had.

The court held that appellants were unreasonable in perpetually ignoring all notices, and specifically the cash value notice, because of McWhorter's earlier assurance that he would take care of everything and that they could ignore all communications.

We believe this case is similar to *Ayres*,[25] because appellant had not specifically inquired about cash value and may not have been alerted by the term "Premature Distribution Value," which was used in some of the letters. We also disagree that the unexpected interest statements provided notice as a matter of law in light of McWhorter's specific instruction to ignore them. *See* our discussion as to appellant Fundaburk, *supra*, and Robert Pinyan, *infra*. Reversed.

## ROBERT PINYAN

Appellant received status reports in 1979, 1981, and 1982 similar to the ones received by appellant Godfrey, *supra*. Appellant did not read these correspondences because McWhorter had told him to ignore them. His last contact with McWhorter was in 1980.

The trial court relied on *Torres v. State Farm Fire & Cas. Co.*, 438 So.2d 757 (Ala. 1983), to support its conclusion that appellant was unreasonable in ignoring the cash value notices. In that case, the plaintiffs went to their agent's office in connection with a claim related to Hurricane Frederic. This was September 12, 1979. One of the plaintiffs stated in her deposition: "The first words out of my mouth when I went to the door were, 'the first thing I want to tell you is that we want flood coverage.'" The agent replied, "I'll take care of it." He did not. In fact, State Farm did not sell flood insurance.

Each following year, the plaintiffs received homeowner's insurance policies but no flood insurance policy. They filed suit after they suffered flood damage on May 4, 1981 and the defendant insurance company denied their claim.

In affirming the grant of summary judgment, the court stated that in light of appellants' burning desire to have flood coverage, a desire born in the wake of Hurricane Frederic, it was unreasonable for them to continue relying on the agent's "I'll take care of it"[26] for a year and a half, despite the fact that they never received any premium notice for flood coverage along with the notices for their homeowner's policy.

Here, appellant relied on McWhorter's "I'll take care of everything," and "ignore all correspondences," for about two years. There were, however, none of the circumstances described in *Torres* which would make this reliance unreasonable as a matter of law.[27] Thus, we reverse.

## EDWARDS [28]

Julian D. Edwards is an 81 year old resident of Birmingham, Alabama. He retired in 1969 after working 39 years as a bus driver for Greyhound. In 1941, Greyhound took out a life insurance policy for him. He has a ninth grade education. In 1924, he sold insurance door to door but claims that he did not receive any training. He was licensed to sell both life and health insurance.

He first met McWhorter in 1978 when McWhorter came by his home and inquired about his life insurance policy with Union Central. Appellant showed McWhorter his policy and the two discussed it.

**25.** *See* our discussion as to appellant Bone, *supra*.

**26.** The court indicated that this was likely a casual remark, made when the agent "was no doubt inundated with claims."

**27.** Appellee's statement of facts creates the impression that Pinyan read the documents and understood that his cash value was underreported. Our review of appellant's depositions shows that he was merely responding to the question whether he thought his cash value was more than $915, the amount reported on the form.

**28.** The defendant/appellee is Union Central Life Insurance Company.

McWhorter returned to appellant's house twice over the next few weeks and discussed Edwards' investment in a more profitable policy. McWhorter convinced appellant to cash in his policy and purchase a new one, which required a one time premium. Appellant signed a form entitled "Policyholder's Change in Service Request" to allow him to cash in his old policy. Appellant received a check of $3,257.00 from McWhorter. He deposited it in his checking account and then wrote a check to United Presidential Insurance (UPI).

McWhorter instructed appellant to fill out a UPI annuity application. Appellant did not read the application, nor did he read the receipt which McWhorter gave him.

The receipt acknowledged payment for a UPI annuity. Appellant thought he was buying a life insurance policy.

In January of 1979, Edwards received his UPI annuity policy in the mail. He did not read the policy. Included in this policy was a page entitled "Flexible Premium Retirement Annuity Proposal" (Proposal) which set forth guaranteed and current cash values at the end of specified policy years, assuming a $3,257 annual contribution. The form also gave current cash value.

Appellant also received an annual report from UPI dated January 2, 1982 providing the status of his annuity policy.[29] Appellant read the report but claims he did not understand it. The form appears as follows:

UPI
1. ACCUMULATED VALUE BEGINNING OF CURRENT POLICY YEAR $2,196.40
2. PURCHASE PAYMENTS RECEIVED DURING THE POLICY YEAR $0.00
3. INTEREST CREDITED FOR THE POLICY YEAR $211.38
4. WITHDRAWALS DURING THE POLICY YEAR $0.00
5. ADMINISTRATIVE FEES $0.00
6. TOTAL ACCUMULATED VALUE FOR THE POLICY YEAR $2,407.78

JULIAN D. EDWARDS
4011 NO 40TH AVE
BIRMINGHAM
AL 35217
 01/02/82 UNITED PRESIDENTIAL LIFE INSURANCE COMPANY
 KOKOMO, INDIANA 46901 7437

FORM NO. 2-7906-81

---

■ The trial court held that the UPI form put appellant on notice of fraud. We disagree. Although appellant has experience as an insurance salesman, he never received any formal training, and has only a ninth grade education. Moreover, he was 81 years of age, and as the Alabama Supreme Court noted in *Ayres*, advanced age is one of the elements to be considered in determining the reasonableness of a plaintiff's failure to make inquiry within the statute of limitations. We do not believe that as a matter of law such an individual would have been put on notice of fraud. Reversed.

## HUNT [30]

In 1980, appellant, a registered nurse, received a premium notice, dated April 20, from United Presidential Life Insurance Company, UPI. She then called McWhorter, who told her that she was not obligated to contribute to the annuity. She does not recall receiving other premium notices, but admits that she might have.

Appellant also received an annual statement dated April 20, 1982, which disclosed that the accumulated value of her annuity was $1,092.46. Appellant read the report but claims she thought the amount repre-

---

**29.** Apparently other annual statements were sent to a post office in Palmesdale, Alabama, where appellant had never had an address.

**30.** The defendant/appellee here is Union Central Life Insurance Company.

sented interest earned over three years. Appellant does not know whether she received any other such statement but admits she may have. Appellant claims she read the April 20, 1982 statement and interpreted it as showing how much interest she had earned over three years. The trial court rejected this argument, stating:

> While in some years by coincidence one number "looks just right" to satisfy plaintiff's interpretation, there is no compatible, plausible explanation for the other figures listed on the cash value statements. Even if the term describing cash value were ambiguous when viewed in the light most favorable to them, plaintiff's interpretation of that number renders the remainder of the statement nonsensical. Plaintiffs are charged with knowledge of the cash values disclosed in these statements, and if they were unable to understand the statements, they could have obtained a competent interpretation.

█ We agree with the trial court. The document is identical in form to the one received by appellant Edwards. The third item on the form listed the interest credited for the policy year at $96.45. The sixth and final entry showed that Total Accumulated Value for the policy year was $1,092.46. It seems to us incredible that appellant could believe that her $2,300 earned $1,092.45 in interest over a three-year period when the document clearly showed that the interest earned in the current year was only $96.45. Affirmed.

### UNEXPECTED INTEREST BILLS: PONDER AND GRISSOM

### PONDER

McWhorter told Ponder that he would not have to pay interest on the loan borrowed against his Lincoln National policy. About three times a year, however, beginning in mid–1978 and continuing to late 1982, appellant received letters from Lincoln National indicating that he owed interest on the loan. According to appellant, this correspondence didn't "look right," so he contacted McWhorter. Each time McWhorter said he would take care of it.

Appellant testified in his deposition that in 1980 he talked to Mr. Ocie Stewart, another Lincoln agent, because of his concern over his dealings with McWhorter. Mr. Stewart advised appellant to call Lincoln National because of the unusual advice from McWhorter.

In April of 1980, appellant called Lincoln National. He complained of misrepresentations as to the interest by McWhorter. Later in April, appellant received a letter from Lincoln National which stated in part:

> You now tell us the money was used to purchase additional insurance with another company. Under the laws of Alabama, when new insurance is purchased through substantial borrowing on an existing policy, you are to be provided with a comparison statement illustrating the effect of the reduction in death benefits on the existing policy and a comparison of values with the new policy. *If you do not have a comparison statement in your possession, you should contact the other insurance company.* We understand the other insurance company is Dixie National Life Insurance Company. Their address is: P.O. Box 22587, Jackson, Mississippi 39205. (Emphasis added.)

The letter also informed Ponder that McWhorter was no longer a Lincoln National agent but was an agent for Dixie National.

█ When asked whether there was any particular reason he didn't contact Dixie National, appellant responded in his deposition, "No. I just hesitated. Procrastinated, put off." Because of this lack of diligence, we affirm.

### GRISSOM

Appellant Grissom received annual interest bills from Lincoln and premium notices from Dixie. When he received the premium notice of July, 1977, he called McWhorter, but McWhorter told him the notice was the result of computer error. He called

McWhorter again when he received the premium notice of July, 1978. Again, McWhorter said this was due to computer error. Grissom took the July 1979 premium notice to McWhorter's office in Birmingham, but McWhorter was not in. Grissom left the premium notice at McWhorter's office. McWhorter wrote him a letter a few days later, explaining that the computers were fouled up and that he was handling everything. Grissom also received premium notices in 1980, 1981, 1982, and 1983.

In the spring of 1982, after receiving a Lincoln interest statement, Grissom called McWhorter. He told McWhorter that the interest was eating his policy up. He told McWhorter that it was his understanding that there was to be no interest on the Lincoln loan. McWhorter stated that Grissom misunderstood him, and in any event, the interest he was earning on his Dixie policy was enough to offset the interest incurred on the Lincoln loan.

The trial court granted summary judgment on the basis of the interest bills and the premium notices, noting as to the latter that a reasonable person would have made inquiry if a computer error had not been corrected after so many years.

Appellant claims that there is a dispute of fact as to whether the interest bills were expected or unexpected. At most, appellant contends, this was a misunderstanding by one inexperienced in insurance matters, and does not constitute notice of fraud as a matter of law.[31] According to appellant, McWhorter had told him that the interest earned on the Dixie policy would offset interest incurred on the Lincoln policy.

▮ Although we doubt whether, in this computer age, where tales of technology gone awry have enlivened many bland gatherings, receipt of the premium notices alone would constitute grounds for summary judgment, these notices, combined with appellant's receipt of interest bills, provide firm grounds for summary judgment. Affirmed.

In summary, we AFFIRM as to appellants Polk, Hitt, Johnson, Walker, Bone, Fowler, Washburn, Ponder, Grissom, and Hunt, and REVERSE as to appellants Fundaburk, Dominick, Cook, Tucker, Spencer, McCown, Haven, Burdick, Russell Pinyan, Robert Pinyan, Godfrey, Nichols and Edwards.

---

31. The trial court noted that appellant admitted in its deposition that more than a year before filing suit he became aware that his impression that the loan bore no interest was incorrect.